## FREDERICK JAMES DUGAN *vs.* JOHN SMITH HOLLINS and wife, and others.

Where a cause is removed from the court of chancery to a circuit court, under the act of 1853, ch. 123, the jurisdiction of the former passes to the latter court, and an appeal may be taken in the *latter court*, from an order or decree in the cause passed by the chancellor, as if no removal had taken place.

Where an appeal is taken in due time, but the record is not transmitted to the appellate court until after the expiration of nine months, still, under the act of 1842, ch. 288, the appeal must be entertained if it does not appear that the *appellant is in default.*

A testator, by a clause in his will, ordered and directed, that as early after his demise as may be practicable, his executors should sell such portion of his "*bank and other stocks*" as shall produce the sum of $27,500, and pay therefrom $13,750 to each of his two sons. HELD:

That these are *demonstrative* legacies, which, when the fund on which they are chargeable does not exceed them in amount, are to be treated, in some respects, as *specific;* they are liable to *abate* with specific legacies in the payment of debts, and entitled to *contribution* from them if the fund demonstrated has been so applied to the exemption of specific legacies.

Where there is sufficient personalty for the payment of debts a *simple contract* creditor cannot resort to the realty for payment, when the realty is devised and is not charged with the debts.

If a specific legacy be taken for the payment of a *simple contract* debt, the legatee will be entitled to contribution from other specific legacies, but he cannot charge with contribution the *real estate* which is devised.

Real estate devised is not liable for the payment of debts until after the whole personal estate, including legacies, shall have been exhausted.

One-third of the excess of the whole assets, over the debts and costs of administration, belong to the widow *absolutely* as *purchaser*, and where she, as specific legatee, is called on for contribution, such one-third must be deducted from the amount of her specific legacies, and the residue only held liable to contribution.

An executrix retained *bank stock* unsold, to await the result of a suit, for a large sum, against the estate; large dividends were received on this stock, and there was no evidence it was considered unsafe, or of any ground for apprehending loss, until the *sudden failure* of the bank, which occurred *before* the termination of the suit against the estate. HELD:

That there was no *devastavit* by the executrix in omitting to sell the stock, and the accidental depreciation of its value, though she was directed by the will to sell it as soon after the testator's death as practicable, to pay legacies.

APPEAL from the Circuit Court for Baltimore city.

Under the bill filed in this case, on the 12th of June 1848, by Frederick James Dugan, against his co-devisees and legatees, in the will of Cumberland Dugan, deceased, the complainant claims from the defendants:

1st. The sum of $13,750, mentioned in the *fourteenth* clause of the will, with interest from the 3rd of December 1836, the date of the grant of administration upon the estate of the deceased.

2nd. The sum of $4583.33, being one-third of $13,750, given to Hammond Dugan, under the same clause of the will, with interest as above.

3rd. One-fourth in his own right, and one-third of one-fourth under Hammond Dugan, of the amount due the estate of the deceased, for payments made as security for Robert S. and John S. Hollins, mentioned in the *fifteenth* clause of the will.

4th. Two-thirds of the sum of $9772.31, with interest from the 18th of February 1847, being the amount paid by the

complainant on the decree in favor of John S. Gittings and others.

And the complainant insists, that no further distribution of any part of the estate, real or personal, of which the testator died seized or possessed, shall be made until he be first paid the several amounts so due him, and if the undistributed estate is not sufficient for such purpose, that he is entitled to a decree, against the defendants, Rebecca Hollins and her children, for one-half thereof, and against the children of Cordelia Margaret Hollins, for the other half. The complainant also contends, that for the purpose of establishing the equality provided for by the will, the parties are confined to the will itself, and have no right to look to the present value of the property specifically devised, or to any gift made subsequent to the will.

By this will, executed on the 5th of October 1832, the testator ordered and directed, that his *"funeral expenses* and *all his just debts* shall be paid, out of *whatever part of his estate* his executrix and executors, or a majority of them, *shall think proper,"* and then devised and bequeathed to his wife, Margaret Dugan, "in lieu of all claim of dower and thirds," a farm called *Duck Cove,* a lease-hold lot, called the *Ferry Point Lot,* appraised in the inventory at $3000, all his slaves, and furniture, and plate, also a *life-estate* in four houses in Cumberland Row, in ten ground-rents from property on Dugan's wharf, yielding about $900 *per annum,* in his dwelling house and lot, and in a stable and lot on Crowls alley. To his two daughters, *Rebecca Hollins,* wife of John Smith Hollins, and *Cordelia Margaret Hollins,* wife of Robert S. Hollins, he devised the *Washington Cotton Factory,* one moiety to each, and also to each a house and lot on Dugan street, worth $925, and a warehouse and lot on Dugan's wharf worth $3525; which devises were made in trust, for the sole and separate use of his daughters, for life, with remainder to their children. To his son, *Hammond Dugan,* he devised one-half the reversion in his dwelling house and lot and the stable and lot in Crowls alley; the reversion in one of the houses and lots in Cumberland Row, one-sixth of the reversion in four other houses and lots, a house and lot on Water street, another

on Dugan street, and a warehouse and lot on Dugan's wharf. To his son, *Frederick James Dugan*, he devised and bequeathed one-half the reversion in his dwelling house and lot, valued at $7725, one-half the reversion in the stable and lot, in Crowls alley, a lease-hold lot, called the *Water Street Lot*, appraised in the inventory at $3000 but valued at $2000, certain lots on Fells Point, valued at $12,823, a house and lot on Dugan street, valued at $925, a warehouse and lot on Dugan's wharf, valued at $3525, the reversion in one of the houses and lots in Cumberland Row, valued at $7700, and one-sixth of the reversion in four other houses and lots. To the children of his son, *Frederick J.*, he devised property worth $7500, a part of which, however, by the construction of the will has been adjudged to belong to the two sons of his daughters, to whom also he devised property worth $14,975, a portion of which, valued at $11,000, has been adjudged to belong to Gittings and others, by the decree already referred to. (The above valuations of the property were made by admissions in the cause.) The *fourteenth* and *fifteenth* clauses of the will are, as follows:

"*Item* XIV. And whereas it is my wish and desire, that my *four children*, Hammond Dugan, Frederick James Dugan, Rebecca Hollins, and Cordelia Margaret Hollins, shall be placed by me *as nearly as possible on an equality*, in the division of my estate, under the present will, and under such conveyances, gifts, &c., as I may have made to them respectively, and also having regard to their respective situations; and whereas the Washington cotton factory, hereinbefore devised to the use of my said two daughters, Rebecca and Cordelia Margaret, was purchased by me for the sum of $27,500, I therefore order and direct that *as early after my demise as may be practicable*, my executrix and executors *shall sell such portions of my bank or other stock*, as shall produce the sum of $27,500, and pay therefrom, to my son Hammond Dugan, the sum of $13,750, and to my son, Frederick James Dugan, the sum of $13,750."

"*Item* XV. And whereas I am, at this time, security on sundry negotiable promissory notes, drawn by Robert S. Hol-

lins in my favor, and by me endorsed, amounting to about the sum of $10,000 more or less; and whereas my daughters, Rebecca and Cordelia Margaret, or either of them, may at this time hold a note or notes of mine, drawn in their favor and each of their favor; now my will and desire is, that the foregoing promissory notes, any or either of them, is to be no charge whatever on my *estate*, but if any claim whatever is made on my *estate*, in respect of said notes or either of them, so endorsed or drawn by me, then and in that case my said daughters, or the one making or occasioning such demand or charge, shall cease to receive and be entitled to receive any share or dividend from my estate, so devised to their use respectively, be wholly determined; and should it so happen that my *estate* should be made responsible for any sum whatever, on account of said notes endorsed or drawn by me, for my said daughters, or for either of their said husbands, then and in that case, I order and direct, that whatever sum may be paid by my *estate*, on said account, shall be charged by my executrix and executors, against my said daughters, or against such one as may have occasioned any such charge on my *estate*."

He then bequeathed fourteen shares of Baltimore and Ohio Rail Road stock to his children, grand-children and great-grand-children, and directed that all instalments on these shares, as they may be called for by the company, shall be paid by "his executrix and executors out of *his estate*." He then directed "his executrix and executors to invest so much money, to be taken from his *residuary estate*, anything in this will notwithstanding, as will produce $150 annually, and pay the same to his grand-son, John Merryman Smith, during life."— The will then concludes, as follows:

"*Lastly*. All my lands in Baltimore county or elsewhere; all my bank, road, insurance, or other stocks, except my Baltimore and Ohio Rail Road stock; all my notes, bonds, mortgages, accounts, or other evidences of debt or claims belonging to me; also my wharf, commonly called "Dugan's wharf," extending from the south side of Dugan's street and running north to Pratt street; also one-half of my said wharf at the head, on Pratt street, with all and singular my claims, rights and de-

mands, for damages appertaining to the same; also the reversion of ten annual ground rents on Dugan's wharf, of about $900 per annum, after the death of my wife; also all the grounds out of which the said rents issue; also all the *rest, residue, and remainder of my estate, real, personal and mixed,* I give devise, and bequeath to my four children," naming them, one-fourth "of the *said entire residue,*" in trust for each of his two daughters, in the same manner as the other property devised in trust for them, and the remaining half "of the *said residue* of my estate" to his two sons, to be equally divided between them.

The testator died on the 1st of November 1836, and the executors named in the will having renounced, letters testamentary were granted to the *executrix,* Margaret Dugan, who gave bond, as such, dated the 3rd of December 1836, with her two sons, Frederick J. and Hammond Dugan, *as her sureties,* and continued such executrix until January 1846, when her letters were revoked and administration *d. b. n., c. t. a.* granted to *John S. Hollins,* and *Rebecca his wife.* It was admitted, that her sons, Frederick J. and Hammond, acted as *agents* of the executrix, and after the death of the latter the former acted as such *agent,* until the revocation of her letters, in the transaction of business generally connected with the administration of the estate.

The inventory and list of debts show an amount of personalty of about $60,000, including the *Ferry Point* and *Water Street* leasehold lots, appraised at $3000 each, and 949 shares of Franklin bank stock at $24.50 per share, making $23,250.50. Of this stock 292 shares were sold by the executrix, in September and November 1840 and June 1841; that sold in 1840 bringing $17, and that in 1841, $5.25 per share. Dividends were regularly declared and received on this stock up to January 1841, when it was admitted the bank failed, and that only the sum of $8739.75 has been realized to the estate from all this stock.

The executrix passed three accounts, the *first* on the 10th of August 1840, showing a balance due the estate of $44,557.51; the *second* on the 29th of March 1843, when the debts of the

deceased, except the Gittings' claim, were paid, and the losses on sales, up to that time, accounted for, showing a cash balance on hand of $6298.14, besides specific property, appraised in the inventory at $24,214.25, including the unsold shares of Franklin bank stock, and the two leasehold lots, above mentioned; the *third* on the 4th of June 1846, after the revocation of her letters, showing, after deducting commissions and specific bequests to the widow, of the *Ferry Point Lot* and other property bequeathed to her absolutely, and the *Water Street Lot*, bequeathed to the complainant and delivered over to him, a cash balance of $3420.40, and stocks appraised in the inventory at $16,214.25, including the Franklin bank stock.

The administrators *d. b. n., c. t. a.* returned an inventory on the 3rd of July 1846, showing that the personal estate of the testator then consisted of certain bank, road and insurance stocks, appraised at $5752.50, including the unsold shares of Franklin Bank stock, at $7.50 per share, making $4927.50. The accounts of these administrators show a balance due the estate of $260.92, as of the 10th of January 1849, after deducting a payment of $4500 on the Gittings' claim, made on the 21st of August 1846, and other allowances. These administrators also brought suit in September 1846, against the executrix, Margaret Dugan, and the complainant, as surety upon her bond, alleging, that she owed large sums of money to the estate, and, instead of paying the Gittings' claim, had, with full notice thereof, appropriated to herself the *Ferry Point Lot*, already mentioned as bequeathed to her, and delivered over to the complainant the *Water Street Lot*, bequeathed to him, and otherwise wasted the assets of the estate. On this suit a judgment was entered, by agreement, on the 12th of June 1848, against the complainant and Margaret Dugan, for the sum of $4710.25, with interest from the 4th of June of 1846, this sum being the aggregate of the balance in the hands of the executrix, as admitted by her last administration account and other moneys received and not accounted for, but this ascertainment was made without prejudice to the right of the plaintiffs to advance thereafter a claim for any loss occasioned by the delay of the executrix in selling any part of the personal estate.

The Gittings' claim, above mentioned, originated in a bill filed on the 3rd of January 1837, by John S. Gittings and others against the executrix and devisees of Cumberland Dugan, claiming a conveyance of certain real estate, (being part of that which was devised by said Dugan's will to the two sons of his two daughters,) and an account of *rents and profits* received from the same by said Dugan, in his life-time, and his executrix since his death. Upon this bill decrees were passed on the 24th of March 1841, and the 25th of March 1843, directing the conveyance prayed for and the payment of $10,870.81, with interest from the 10th of December 1841, on account of the claim for *rents and profits*. These decrees were, upon appeal, affirmed by the Court of Appeals, at its December term 1845, and the cause being remanded, subsequent proceedings were had therein to make the leasehold and personal property, bequeathed by Cumberland Dugan, and then in the possession of Frederick J. Dugan, the present complainant, responsible for the amount thereof; and pending such proceedings the said Frederick, on the 18th of February 1847, paid the balance of the decree then remaining due, with costs, amounting to the sum of $9772.31, and had the same entered to his use.

Hammond Dugan died in 1841, leaving a will devising to his mother his entire property. His estate was settled up and his debts paid by a contribution from the complainant and his sisters. After the death of Hammond, his mother, Margaret Dugan, by two deeds dated the 25th and 26th of March 1841, conveyed all the property devised to her by Hammond, including the *Duck Cove* farm which she had previously conveyed to him and re-acquired under his will, and the *Ferry Point lot* bequeathed to her by her husband's will, in trust to be divided amongst her three surviving children by commissioners named in the deeds. This partition was made, and being approved by the parties, was *confirmed and perpetuated* by a deed between them, dated the 1st of July 1844, by which the complainant granted, released and confirmed, to his sisters, the parts allotted to them respectively, and they did the same in reference to his part. By this partition the complainant

had allotted to him the *Ferry Point lot* at a valuation of $2500.

Margaret Dugan was subsequently, on the 18th of June 1846, upon proceedings instituted for that purpose, in Baltimore county court, declared a lunatic, and the wife of the complainant appointed the committee of her person, and the son of Cordelia M. Hollins committee of her estate. After the bill in this case had been filed the said Margaret died, and her committee passed an account by which the sum of $13,438.72 was accounted for, leaving a balance of $706.61 in his hands, subject to the order of the court, which balance was divided amongst the complainant and the other representatives of the said Margaret, without an administration upon her estate; and the furniture on hand at her death was likewise specifically divided in the same way. The slaves given to her by her husband's will, she had manumitted in her life time with the consent of the complainant and his sisters.

The record also shows, that proceedings were instituted in Baltimore county court, by John S. and Robert S. Hollins and their wives, against the complainant, for the partition of a farm in Baltimore county, constituting part of the *residuum* of the testator's estate not specifically devised, upon which a decree was passed by consent, on the 29th of March 1847, ordering a sale for partition. The proceeds of such sale were distributed amongst the parties to that cause, but before the decree was passed it was agreed between them, that the payment over to the complainants in that case, of their shares of the sale, should not prejudice the present complainant, Frederick J. Dugan, in any suit between the parties in relation to the distribution and settlement of the estate of said Cumberland Dugan.

It was admitted, (in reference to the complainant's *third* claim,) that John S. Hollins and Robert S. Hollins failed in business in 1833, and applied for the benefit of the insolvent laws, and obtained discharges thereunder, the latter in April 1834, and the former in June 1840; that in the year 1829, Cumberland Dugan began to endorse for the accommodation of his son-in-law, Robert S. Hollins, who conducted the

Washington Factory on joint account with his brother; that this accommodation, at the date of the will, 5th of October 1832, consisted of endorsements of notes to the amount of $10,320, and advances in cash to the amount of $3000 more, and continued in this condition until the 30th of May 1835, when Cumberland Dugan made affidavit to his claim upon said notes and cash loaned, against the insolvent estate of Robert S. Hollins, and filed the same with his trustees; that the notes which were the basis of this claim had been taken up by said Cumberland in the year 1834, *in his life time,* and that upon the claims as filed with the permanent trustee, the executrix, Margaret Dugan, received a dividend of $910.54 from the insolvent estate of said Hollins.

It was also admitted that after the date of his will, Cumberland Dugan advanced the sum of $3400 to the complainant, to enable him to purchase a house; and that the testator's daughter, Cordelia M., wife of Robert S. Hollins, died in January 1848, leaving a will, by which, in execution of the power secured to her under the deeds from her mother, of the 25th and 26th of March 1841, above mentioned, she devised all the estate conveyed to her by these deeds to a trustee, for the benefit of her husband during life, with remainder to her children; and that since the filing of the bill the complainant has been found a lunatic, upon proceedings duly instituted for that purpose.

The *bill* in this case, filed as above stated, avers that by the will of the testator the entire interests of the daughters in the estate are charged with the payment of the legacies of $13,750 given to the complainant and his brother, Hammond, by the *fourteenth* clause of the will, and with such other sums as may be required to effect that perfect equality which the testator designed should exist amongst his children in the distribution of his estate; *that* the sums which the testator advanced and loaned to John S. and Robert S. Hollins are, with interest, a charge upon the shares or interests in the estate of the testator devised to his daughters and their children; *that* the devisees and legatees have entered into possession of the several parcels of real and personal property specifically devised and

Dugan *vs.* Hollins, *et al.*

bequeathed to them, but no distribution of the general residuum of the estate has been made, nor has any part of the aforesaid legacies of $13,750 each, been paid, and the stocks which were specially set apart and devoted by the will to their payment, have been applied to the payment of the debts of the testator; *that* in order to prevent a sale of his estate, the complainant paid the residue ($9772.31) of the decree in favor of Gittings and others, on the 18th of February 1847, and had the same entered to his use, and though his property was liable for the whole amount of this claim, yet he is advised and charges that it was equally chargeable upon the estates devised to Hammond and the daughters, and that each of the daughters ought to have paid and contributed one-third part thereof; *that* the administrators *d. b. n., c. t. a.* have sued the complainant at law, as security on the bond of Mrs. Dugan, the executrix, for a *devastavit* alleged to have been committed by her; *that* Mrs. Dugan has been declared a lunatic, and that the property and effects in the hands of her committee ought to be applied to make good any *devastavit* she may have committed in exoneration of her sureties, and that Hammond Dugan having been one of the sureties, his estates in the hand of his devisees or alienees is justly chargeable with one-half of this pretended waste. The bill then prays for an account of the estate of the testator, and of the several claims of the complainant, in respect of said legacies of $13,750, and of the payments made by the testator for John S. and Robert S. Hollins, and of the payment made by the complainant on account of the decree in favor of Gittings and others, and that the administrators *d. b. n., c. t. a.* may be enjoined from prosecuting their aforesaid action at law against the complainant.

The defendants by their *answers* insist that the whole personal estate of the testator, whether specifically bequeathed or not, was chargeable with his debts, in exemption of his real estate, and deny that the will charges the real estate, or any part of it, with the payment of any of the debts or legacies, or that any part of the Gittings' claim paid by the complainant can be brought against them, or against the real estate devised to them by specific devise or otherwise, but, on the contrary,

they allege that the complainant was first bound to apply the amount of the judgment for *devastavit* ($4710.25, with interest from the 4th of June 1846,) in reduction of the amount paid by him on account of the Gittings' claim, and that then the specific bequests in the hands of the complainant were next liable for the balance of said claim, which bequests were worth much more than such balance. They deny that Mrs. Dugan personally, or any part of her estate, should be held liable on account of the judgment for *devastavit*, or for any default or waste for which the complainant may be shown to be liable, or for any part of his claim as assignee of Gittings and others, because they say that the complainant and his brother, Hammond, as long as the latter lived, were, from the death of the testator, the agents of the executrix in the administration of her husband's estate, and that upon the death of Hammond, the complainant was her sole agent in that respect, and she relied entirely upon him in the administration of the estate, and that for many years past, and before she was declared *non compos mentis*, she was, from extreme age and imbecility of mind, incapable of exercising any judgment in regard to the affairs of the estate; they allege that Hammond Dugan duly accounted for the assets of the estate received by him, and are, therefore, advised and charge that the complainant cannot, under the circumstances, throw off the liability for any *devastavit* in the administration from himself upon his mother or the estate of his deceased brother. They further insist that by the partition and the deed of July 1st, 1844, carrying out the same, the complainant is concluded from setting up any of the claims mentioned in the bill against any of the property of Hammond Dugan, which, by such partition and deed, was vested in the respondents or any of them. They deny that the legacies of $13,750 to each of the testator's sons, to be paid by the executors out of the sales of the bank and other stocks, can be charged upon any part of the testator's real estate devised specifically or otherwise to the respondents, or vested in them in any other way or manner; and they further say that from the particular clause mentioning these legacies, as well as from the whole will, it is clear the testator meant to

make them a charge upon his personalty alone, out of which pecuniary legacies are generally payable; and they also submit whether, under this clause, taken in connection with other portions of the will, these legacies are to be considered more than *general* legacies, but if deemed specific legacies of so much bank or other stock to pay them, the respondents will then contend that as it was the duty of the complainant, as agent and surety of the executrix, to have obeyed the directions of the will, and sold, without delay, a sufficient amount of stock to pay them; any loss arising from the delay in selling the stock should be borne by the complainant. The two sons of the testator's daughters, answering for themselves, say that the reversion in the property, which was decided to belong to Gittings and others, was devised specifically to them, and that by the decree in favor of Gittings, they have lost the value thereof, and they now insist that if the complainant is entitled to claim of them, or any of the respondents, as legatees or devisees of the testator, to make good any loss arising from the application of the bank or other stocks to the payment of the debts of the estate, they are equally entitled to claim of the complainant, as devisee of their testator, to make good in part the loss of the property so devised to them, and they will, in that case, set up their claim against the complainant as such devisee. The respondents also aver that the liabilities referred to in the *fifteenth* clause of the will, were all paid by the testator *in his lifetime,* and they deny that this clause embraces such liabilities *so paid,* but only refers to and means to secure the liabilities of the testator, by reason of the particular notes therein specified, which should not be paid or settled by the testator *in his lifetime,* but should become a demand or charge upon *his estate,* to be paid by his executors; and they further deny that there has been any charge made against the estate by reason of any note or notes referred to in said clause, as held by the testator's daughters, or either of them. The respondents, John S. and Robert S. Hollins, rely upon their discharge under the insolvent laws in bar of any personal claim against them, and the respondents generally rely upon lapse of time and the statute of limitations as a bar to the complainant's several claims.

The respondents also filed exceptions denying that under the *averments of the bill*, the complainant can claim payment for any *devastavit* on the part of Margaret Dugan as executrix, either from her or her estate, in the hands of her committee, or can claim any portion of the estate of *Hammond Dugan*, in the hands of the respondents, for any liability of his as co-surety on the testamentary bond of his mother or otherwise, or can claim as one of the assignees of his mother of Hammond Dugan's estate, and the other property conveyed in the deeds from his mother of the 25th and 26th of March 1841. They also aver in these exceptions that the above claims, or some of them, if embraced in the averments of the bill, and likewise any claim of the complainant to any fund in the hands of the administrators *de bonis non* of Cumberland Dugan, are properly cognizable in a court of law, and not in a court of equity.

The cause was then submitted to the chancellor (JOHNSON,) who delivered an opinion on the 26th of January 1854, which is reported in 4 *Md. Ch. Dec.*, 139, and on the same day passed an order referring the case to the auditor, to state accounts in conformity with the views expressed in his opinion, and reserving "*all questions not therein decided*" for further consideration and order. On the 9th of March following, the cause was removed to the circuit court for Baltimore city, under the act of 1853, ch. 123, and on the 26th of May following, the complainant entered *an appeal* in the *latter court* from the above order or decree of the chancellor.

The special auditor, to whom the case had been referred, then made his report, accompanied by several accounts, to which both parties filed exceptions. These exceptions being argued, the court, (KREBS, J.,) on the 15th of June 1855, delivered the following opinion thereon:

"The accounts to which these exceptions are filed, was stated by the special auditor, according to the principles, as he understood them, and under the direction of the chancellor's opinion, delivered on the 26th of January 1854. The chancellor, in deciding the case, says, that he is of opinion that the complainant, Frederick J. Dugan, has a right, in a court of

chancery, to call upon the other parties to the partition referred to in the case ' to contribute their fair proportions of the money paid by him in discharge of the decree in favor of Gittings and others, mentioned in the proceedings.' In this passage the chancellor was regarding the parties solely as co-parceners, and deciding that when one had paid money in discharge of a paramount lien or claim upon his share, the others were bound to contribute equally to reimburse him. But the chancellor proceeds to state, that ' by the last clause of the will of Cumberland Dugan, he bequeathed all the *rest* and *residue* of *his property*, *real*, *personal* and *mixed*, partly by specific description and partly in general terms, to his *four children*, Rebecca Hollins, Cordelia Margaret Hollins, Hammond Dugan and Frederick J. Dugan, the shares given to his daughters being in trust. And *it is alleged*, and the allegation not *seriously* if *at all denied*, that *some property* embraced in this *residuary clause remains* to be distributed. *Especially* it is said that *ground rents amounting* to $900 *per annum*, in which the testator's widow (now deceased) had a life estate, and *which constitute* a *part* of the *residue*, yet *remain to be distributed.* And the complainant *insists* that *no further distribution shall be made*, including the amount in the hands of the administrator of Margaret Dugan, *until he is paid the sum due him.* It being the opinion of the court that the complainant is entitled *to contribution, in respect to the amount paid by him*, in satisfaction of the decree obtained by Gittings, *an account* must *be stated* for the *purpose* of *ascertaining how much he is entitled to*, and it *would seem proper*, in the mean time, that *no further distribution should be made*, as insisted on by the complainant.'

" It must be understood, from this portion of the chancellor's opinion, that he looked to this residue of the testator's estate, real, personal and mixed, as property to be taken into view in settling the question of contribution between the parties, especially the ground rents amounting to $900 *per annum*, which, as he states, constitute a part of this residue, and this is the more manifest from the fact, that he says that no further distribution of it should be made, because if it was not to be

held to be applied, as it might be deemed equitably liable, for contribution to reimburse the complainant, there was no reason why it might not have gone, at once, into the hands of the parties entitled to this residue. It is assumed by the chancellor, and conceded by the parties, that the personal estate of the testator, not specifically bequeathed, is insufficient to pay or refund the balance of this decree paid by Frederick J. Dugan; and if he meant to intimate, and I think it cannot be questioned that he did, that this real estate in the hands of the general residuary devisees was liable to pay this balance, this intimation must rest on the ground that a residuary devise of real estate is applicable to the payment of the debts of a testator before specific legacies of personal estate. That this is a general residuary devise of all the testator's estate, not previously devised or bequeathed specifically in his will, is manifest from the language employed by the testator. After specifying certain portions of it, in dividing it amongst his children, he describes it as 'the said entire residue.' In the case of *Spong vs. Spong*, 3 *Bligh*, 105, the court, after maturely considering the question, for it was one of the points on which the decision of the court below was reserved, decides that a residuary devise of real estate is not a specific devise, and the reasoning of the judge who delivered the opinion in the House of Lords, is conclusive to show that these two descriptions of devises differ entirely in their character, and I am of opinion that a general residuary devise of real estate is not entitled to any such privileges as would exempt it from being resorted to for the payment of the debts of the testator, after exhausting his personal estate not specifically bequeathed. I do not think that the opinion of the Court of Appeals in *Chase vs. Lockerman*, 11 *G. & J.*, 185, conflicts in any degree with the position above assumed. On the contrary, I think it is sustained by the principles and reasoning set forth in that opinion. The 'general rule of marshalling assets,' the court says, 'is to apply first the personal estate, then lands devised to be sold for the payment of debts, then lands descended, lastly, estates specifically devised, even though they are generally charged with the payment of debts.' Now the court did not intend to include in

the *personal estate* to be *first applied* under this rule, personal property specifically bequeathed, as the Court of Appeals says, in the case of *Alexander vs. Worthington*, 5 *Md. Rep.*, 493, 'it was assumed in *Chase vs. Lockerman*, as a point clear in all the authorities, that land descended was first applicable in payment of debts in relief of personal estate specifically bequeathed,' and this question, the court says, in the former case, 'is too well settled in England and in this country, to justify argument thereon.' When, therefore, would the leasehold estate of this testator, which he has specifically devised, the only portion of his estate, with a trifling exception, not yet applied to the payment of his debts, be resorted to for that purpose, according to the order of appropriation prescribed by the above rule? It cannot be doubted, I apprehend, that it would come in '*lastly*' amongst 'the estates specifically devised,' and would consequently be resorted to after a *general residuary devise*. It is to be observed that this testator 'orders and directs his funeral expenses and debts to be paid out of whatever part of his *estate* his executrix and executors, or a majority of them, shall think proper.' He does not restrict them to his *personal estate*. He then makes a number of *specific* devises and *specific* bequests, one of the latter to his wife, and lastly, devises and bequeaths various enumerated parcels of his real and personal estate, together with the general residue, real, personal and mixed, as an *entire residue*, to his four children: '*all* his stocks,' except the Baltimore and Ohio rail road stock, '*all* his notes, bonds, mortgages, accounts, or other evidences of debts or claims,' including his whole personal estate, except specific legacies, together with several parcels of his real estate.

"It cannot be doubted that he intended his debts to be paid out of this 'entire residue,' as he denominates it, especially as he does not designate particularly any part of his estate out of which they are to be satisfied. He certainly could not have meant that his specific legacies should be taken whilst any part of this residue was unapplied. And I am, therefore, of opinion that the devisees, under this residuary clause, can only claim that part of the 'entire residue' that remains after all

8      v. 11

the debts are satisfied.   That he did not intend this residuary devise of all his stocks, and of the real estate included in it, to be taken by the devisees to whom it was given as a specific and absolute gift, is manifest from the fact that though he gives them 'all his stocks,' yet in a preceding part of his will he directs his executors to sell 'such portions of his bank or other stocks' as shall produce the sum of $27,500, and in another part of his will he directs 'as much money to be taken from his *residuary estate* as will produce $150 annually,' to be paid to one of his grandsons, evidently looking to it as the fund to meet the pecuniary demands upon his estate, whether created by his will or by obligations existing in his life time. And further, it was the manifest purpose of the testator to equalize the shares of his estate, that his four children were to take under his will, and in making this equal division by his specific devises and bequests, he allots to them, respectively, various parcels of his property, giving to one, as he did to his son Frederick, a leasehold lot of ground, and the improvements thereon, in the city of Baltimore.   Now if this specific legacy, or any part of it, should be taken to pay debts, the equality which he has so carefully established, would be disturbed, whereas, by taking from the residuary devise, which he gave to them equally in real and personal property, so much as may be necessary to pay all his debts, this equality is not at all affected.

"Being of opinion, then, that so much of the amount of the decree paid by Frederick J. Dugan, as the personal estate of the testator, other than his specific legacies, is insufficient to satisfy, must be supplied by the real estate embraced in this general residuary devise, the next inquiry is, what personal estate is there other than specific legacies?   There is, 1st, a small balance in the hands of the administrators *de bonis non,* and 2nd, the amount of a judgment for a *devastavit* committed by the executrix, Margaret Dugan, rendered against her and Frederick J. Dugan, he and Hammond Dugan being the securities on her administration bond, the latter having died before the suit was brought.

"The defendants, in their answer, insist that the complain-

ant should be made liable for the whole amount of this *devastavit*, because he, and his brother Hammond, so long as he lived, were, from the death of their father, the agents of their mother, the executrix, in the administration of the testator's estate, and, after the death of Hammond, the complainant was sole agent, when she relied entirely upon him in the administration of the estate, and for many years before she was declared *non compos* she was incapable of exercising any judgment in regard to the affairs of the estate; and they allege that Hammond duly accounted for the assets of the estate received by him, and that the complainant cannot throw off the liability for this *devastavit* upon his mother, or the estate of his deceased brother. This right, claimed by the defendants, to charge the complainant with the amount of this *devastavit*, is founded upon the imputation that he, whilst acting as agent as aforesaid, received and retained this money, and never accounted for it to the executrix. This court cannot act upon the assumption that he really did this without proof of the fact. The whole allegation in the answer, upon this subject, is new matter introduced by the defendants, and the burden of proof is upon them to show, by evidence, that he was an unfaithful agent. The admissions in the cause do not furnish this evidence. They say that Hammond accounted for all the assets that came into his hands as her agent. Why may not the complainant have accounted likewise? This *devastavit* might have occurred long before Mrs. Dugan became *non compos*, and at a time when she was perfectly competent to attend to the affairs of her husband's estate, which she no doubt was at the time of his death, otherwise the testator would not have appointed her executrix. There is no evidence of habits of waste or extravagance on the part of the complainant which might afford grounds for supposing that he squandered this money, or that specific sums of money came into his hands under such circumstances, either in regard to amounts or otherwise, as would justify this court in regarding him as having appropriated this money to his use. In fact there is nothing in the cause to satisfy the court that he should be charged with it, for the reasons stated by the defendants.

"In this view, Mrs. Margaret Dugan having been primarily liable to make good this *devastavit*, whatever estate she left at her decease should be applied in reduction of this judgment, before her securities, or their estates, can be called upon to contribute. Her estate, it appears, was of inconsiderable value, and is in the hands of the complainant and the defendants, in equal shares, and the amount of it must be contributed by the three equally, in reduction of the judgment, and unless they can agree amongst themselves in regard to the value of her estate, it must be ascertained by the auditor of this court. The balance of this judgment must be paid, one-half by the complainant, as one of the securities of Margaret Dugan, on her administration bond, and the other half out of the estate of the other security, Hammond Dugan, in the hands of the complainant and defendants, in equal shares, and sufficient to pay the share of said judgment, for which he was responsible.

"The balance of the said decree that may remain unsatisfied, after the application of the personal estate of Cumberland Dugan, to be derived from the above sources, must be obtained from the real estate mentioned in the said general residuary clause. The court will pass such order, referring this case to the auditor, and decree for the sale of property, as may be necessary to furnish relief to the complainant, upon the principles indicated in this opinion."

The court, accordingly, on the 5th of July 1855, passed a decree for a sale of the residuary estate of the testator, remaining undistributed and undisposed of, to repay the complainant the amount paid by him in discharge of the decree in favor of Gittings and others, and referring the case to the auditor to state accounts, in conformity with the principles decided in the above opinion. From this decree the *complainant* entered *an appeal*, on the 29th of September 1855, and the record was transmitted and filed in the appellate court on the 23rd of November 1855. Afterwards, on the 9th of February 1856, and after the auditor's report and accounts came in, the *defendants* entered *an appeal* from the same decree, and it was agreed that one common record should be used at the hearing of all the appeals taken by both parties.

The cause was argued before Eccleston, Tuck and Bartol, J.

*Thomas S. Alexander and John Nelson*, for the complainant argued:

1st. That the order of the chancellor, of the 26th of January 1854, is open for review upon the complainant's appeal. 1st. The appeal was entered in the proper *forum*. The cause was removed, after the passage of this order, from the Court of Chancery to the Circuit Court, and the appeal was entered in the latter court, where the *record* was, which it is the object of an appeal to bring up. By the Constitution and laws, relating to the removal of cases, these two courts were one and the same as *to this case;* the Court of Chancery was abolished, but the proceedings in it were not abolished. Upon the removal of the proceedings in this case, the jurisdiction of the Chancery Court passed to the Circuit Court, and the case stood in the latter court precisely as if there had been no removal. 8 *Md. Rep.*, 322, *Brown vs. Gilmor.* 1 *Bland*, 67, *Strike's case.* 2nd. The appeal was taken in *due time*, and that the record was not transmitted within nine months, does not appear to have been the fault of the appellant, and the appeal must therefore be entertained, 9 *Gill*, 440. *Hannon vs. Robey.* 3rd. But the appeal from the *final* decree in the case passed by the Circuit Court, which was taken in due time, and is free from all objections, brings up for review all *previous* orders or decrees passed in the cause. Acts of 1830, ch. 185, sec. 1, 1841, ch. 11, and 1845, ch. 367, sec. 3. The *final* decree meant by these acts is the decree finally *disposing* of the case, and upon appeal from such decree all *previous decrees* and *orders*, whether *final* or *interlocutory* are open for review. 3 *Gill*, 138, *Dugan vs. Gittings.* But the decree of the chancellor was, in fact, an *interlocutory* and not a *final* decree, or an order in the nature of a final decree, and is, therefore, clearly open for review upon the present appeal from the final decree. Neither the entry of an appeal from this order and the failure to prosecute it, nor the removal of the cause can affect the right to review the merits of this decree

upon this appeal. It was clearly competent for the Circuit Court, at all times before the final decree, and at the time of passing the final decree, to correct errors in any antecedent decree or order, or proceeding in the cause. 6 *H. & J.*, 114, *Snowden vs. Dorsey.* 12 *G. & J.*, 285, *Clagett vs. Crawford.* 1 *Md. Rep.*, 394, *Young vs. Frost. Md. Ch. Pr.*, 178. 3 *Md. Rep.*, 555, *Ware vs. Richardson.* 3 *Md. Ch. Dec.*, 398, *Young vs. Mackall. Ibid*, 431, *Williams vs. Savage Manf. Co.* 16 *How.*, 82, *Fourniquet vs. Perkins.*

2nd. That the complainant's *first and second* claims founded upon the *fourteenth* clause of the will should have been allowed. In this clause the testator in order to equalize the shares of his four children, directs his executors to sell such portion of *his bank and other stocks*, as shall produce the sum of $27,500, and pay therefrom $13,750 to each of his two sons. These are *demonstrative* legacies, which failing the fund upon which they are charged are mere general pecuniary legacies payable out of the residue of the estate, *but, to the extent of the fund* chargeable, are in the nature of *specific* legacies; the bank and other stock, are appropriated by the will to their payment, and, to the extent of these stocks, they are *specific* bequests. 3 *Ves. & Bea.*, 2, *Smith vs. Fitzgerald.* 1 *Merivale*, 178, *Acton vs. Acton.* 2 *Wms. on Exc'rs.*, 993, 995, 999, 1003, 1174. These stocks have been applied to the *payment of debts*, and we now insist that the complainant's first two claims should have been allowed. 1st. Because *real estate* passing under a residuary clause of a will ought to be applied to the payment of debts to the *entire exoneration* of personal estate *specifically bequeathed.* That there is a *residuary* clause in this will, is clear from the fact that the testator speaks of it as a *residue*, charges money on it as a *residue;* and though there is no residue *descending* to heirs at law, yet there is a residue devised to those who would be heirs at law in the same proportion as they would take by descent; assuming then that there is a residuary clause, we say the real estate passing by it is to be applied to pay debts to the *entire exoneration* of specific legacies. 2nd. Because the intention of the testator to apply the proceeds of his bank and other stocks to these legacies, is

explicitly set forth in the will for the purpose of producing equality amongst his children; and the *charge* of the *debts upon his realty*, not specifically devised, is *equally manifest.* 3rd. Because the personalty specifically devoted to the payment of these claims, having been applied by the executors to the payment of debts, the legatees are entitled to be substituted to the creditors and paid out of realty not specifically devised, and in the event of an insufficiency of this general fund may claim *contribution* from all other legatees and devisees of the testator.

In support of these positions we refer to *Ambler*, 127, *Hanby vs. Roberts*, and the same case in 1 *Dickens*, 105. 1 *Dow. & Clark*, 365, *Spong vs. Spong*, and same case in 3 *Bligh N. S.*, 84. 2 *Myl. & Cr.*, 707, *Mirehouse vs. Sciafe.* *Sugden's Law of Prop.*, 423 to 426, 64, in *Law Lib.*, 290. These authorities clearly show that our positions are correct where the debts to which the specific legacy has been applied are *specialty debts;* and the case of *Chase vs. Lockerman*, 11 *G. & J.*, 204, settles the law in this State in the same way, so far as *such debts* are concerned. But as the debt paid in this case was a *simple contract* debt, it is objected that the specific legatee cannot call upon the devisee of the realty for contribution, and the case of *Chase vs. Lockerman*, is relied upon as sustaining this distinction between *simple contract* and *specialty* debts. It is true that in that case the right of contribution as against the devisees of the realty is denied in case the debts to which the specific legacies have been applied are *simple contract* debts, but that question did not as we think arise in the case, and the decision therefore upon this point is but an *obiter dictum*. Nor is there any *reason* why such a distinction should exist in this State. In England the specialty debt equally charges personal and real estate, but the simple contract debt does not charge the land, and for this reason the legatee in England cannot cast any portion of the debt by simple contract on the land devised or the land descended. But our acts of 1785, ch. 72, sec. 5, and ch. 80, sec. 7, subject lands descended in the hands of the heir, and land devised in the hands of the devisee, to the payment of debts by *simple contract* and debts

by *specialty*, in *equal degree.*  These acts are not referred to either by the court or the counsel in the argument of the case of *Chase vs. Lockerman.*  Again, by our testamentary law (act of 1798, ch. 101, sub-ch. 8, sec. 17) specialty and simple contract debts are placed upon an equal footing, and are to be paid without priority or preference.   Upon principle, therefore, there is no reason why any such distinction should be observed in this State, and we think this court has so decided in the cases of *Magruder & Tuck, vs. Carroll,* 4 *Md. Rep.,* 335, and *Alexander vs. Worthington,* 5 *Md. Rep.,* 417.

3rd.  That the chancellor also erred in not allowing out of the residuary realty before distribution thereof amongst the residuary devisees, the complainant's *third* claim for his proportion of the moneys paid by the testator for the husbands of his two daughters as directed by the *fifteenth* clause of the will, the payment being admitted.   And it is further insisted, that in the event of the insufficiency of such residuary estate, all other interests of the daughters taken under the will are liable for those payments.

4th.  In opposition to the appeal taken by the defendants, and in support of the complainant's *fourth* claim, which is allowed by the decree, we insist:

1st.  That the claim of *Gittings* and others, bound all the estate of the testator in due order of administration.

2nd.  That, (for reasons already assigned,) after exhausting the personal estate not specifically bequeathed or appropriated, this claim was payable out of the residuary estate, as well real as personal, in exoneration of the personal estate specifically bequeathed or appropriated.   And this exoneration of the specific legatee rests as well on the general principle, that the residuary estate, whether real or personal, and whether devised as residue or suffered to descend, is liable for payment of debts in relief of the specific legatee, and of the specific devisee, as on the intent of the testator clearly expressed.

3rd.  That there is nothing in the chancellor's opinion which conflicts with these views.   He expressly declares that the complainant is entitled to compensation out of the residuary estate, to the extent of his entire payment to Gittings.   The

only error imputable to the chancellor, consists in his assuming that the Ferry Point lot was liable on any principle and in any state of circumstances to contribution. As that lot was bequeathed to the widow in lieu of dower she was to be treated as a purchaser thereof for valuable consideration, and as between her and the complainant claiming under her on the one hand, and all other legatees and devisees of the testator, on the other hand, this lot was entirely exempt from payment of debts. *Act of* 1798, *ch.* 101, *sub-ch.* 13, *sec.* 5. 10 *G. & J.,* 113, *Gibson, et al., vs. McCormick.*

4th. Upon the same principle that the widow is a purchaser for valuable consideration of all interests given her in lieu of dower, the other personal property specifically bequeathed to the widow is to be thrown out of the account; and especially is the claim of the defendants, that the value of those specifics shall be applied in satisfaction of the Gittings' claim, inadmissible, since those specifics have, in fact, been distributed to those defendants and the complainant, as the representatives of the widow.

5th. The complainant, as assignee of Gittings and others, became subrogated to the original rights and equities of the original claimants; and in this aspect his claim is to be reduced only by any balance which may be found in the hands of the administrator *de bonis non* of the original testator.

6th. The complainant denies that the Water street lot, though lease-hold, is liable, as between the legatees and devisees of the testator, to the reimbursement of the payment made by the complainant to Gittings, until after the exhaustion of the entire residuary estate of the testator; and in the event of the exhaustion of such residuary estate, this lot is to be brought into contribution with all other property specifically devised by the testator.

7th. It is denied that the claim of the complainant is liable to be reduced by the sum, or any part of the sum, recovered by the administrator *de bonis non* against Mrs. Dugan, the executrix, and the complainant, one of her sureties. But if that judgment is to be brought into the account it is to be reduced, *first,* by the value of the personal estate of Mrs. Dugan, which

9      v. 11

was distributed amongst her children; *next*, by the value of her estate which came to the hands of her committee; *next*, by the value of said estate in the hands of her administrator, and *lastly*, the balance then remaining, if any, is to be apportioned between the complainant and Hammond Dugan, deceased, who was co-surety with complainant for the executrix; so that the complainant may be accountable for only one-half part of said balance and one-third part of the remaining half.

*Frederick W. Brune and Wm. Schley*, for the defendants argued:

1st. That the decree of the chancellor, of the 26th of January 1854, in so far as it rejected the first three items of claim on the part of the complainant, is not open for review on this appeal. 1st. Because the appeal was not taken in the proper *forum*. There is no provision by law authorising an appeal in one court from a decree passed in another. By the act of 1826, ch. 200, the appeal must be entered in the court in which the decree is passed, and there is nothing in the acts providing for the removal of causes from the Court of Chancery to the circuit courts, which permits an appeal to be taken in the latter from a decree passed by the chancellor. A party has no *constitutional right* of appeal: it is a matter of favor granted by acts of Assembly, and must be taken *modo et forma* therein prescribed. 1 *Bland*, 17 *Ringgold's case*. 6 *Cranch*, 314. *Durosseau vs. The United States*. 2nd. Because the appeal, if properly taken, was not duly prosecuted, the record not having been transmitted within *nine months*. Whenever an appeal is taken from a *final* decree, the record must be brought up within nine months, and as we insist, this decree of the chancellor was a *final* disposition of the *first three* items of claim on the part of the complainant. Four different claims are presented by the bill, as distinct from each other as if made by different parties. Three of these the chancellor rejects, and as to the fourth, only directs an account to be stated. This is as much a final disposition of the three rejected claims as if the *bill* had been *dismissed* as to them, and that such a decree would have been final, this court has decided in *Hitch*

*vs. Davis,* 8 *Md. Rep.,* 524. Did not the absolute *rejection* of these *first three* claims materially affect the complainant's rights? did it not determine a question of right between the parties? If it did, then it was the subject of an *immediate appeal,* and was a *final* decree within the meaning of the acts of 1830, ch. 185, and 1845, ch. 367, and the present appeal by the complainant was prosecuted too late, the complainant himself being answerable for the delay. 5 *Md. Rep.,* 368, *Sample vs. Motter. Acts of* 1841, *ch.* 46. 1842, *ch.* 288. 3rd. Because the only view in which the chancellor's decree can be considered as open on this appeal is, that the circuit court erred in following the decision of the chancellor, and the appeal from the decree of that court, taken by the complainant, on the 29th of September 1855, brings up for review all *previous* decrees and orders in the cause, under the 3rd sec. of the act of 1845, ch. 367. But the decree of the circuit court, from which the complainant appealed, is a decree simply directing an *account* to be taken, and referring the case to the auditor for that purpose, and is not, therefore, *"the final decree or order"* meant by the section of the law referred to.

2nd. That if the chancellor's decree is open for review, in reference to the rejected claims, it should be affirmed for the reasons assigned in his opinion, in 4 *Md. Ch. Dec.,* 139 to 146, and others hereinafter presented. The legacies in the *fourteenth* clause of the will are not *charged* upon the *real estate,* either expressly or by implication. The personal estate is the primary fund for their payment, and the real estate, in the hands of the devisee, is never charged with such payment, unless the intention so to charge it is expressly declared or fairly and plainly to be inferred from the terms of the will. 2 *G. & J.,* 32, *Simmons vs. Drury.* 10 *Do.,* 143, *Stevens vs. Gregg.* These cases decide, that even a *charge upon the land devised* does not, in equity, exempt the *personal estate* from *primary* liability for the payment of debts and legacies. Besides, under the facts in the record and the various acts of the complainant, and especially by reason of the proceedings between the complainant and his sisters for a partition of Hammond Dugan's property, the complainant is estopped from setting up any

claim, as one of Hammond Dugan's representatives, against his sisters, by reason of the bequests in favor of Hammond, under the fourteenth and fifteenth clauses of the will. And in reference to the entire claim of the complainant, under the *fifteenth* clause of the will, being the *third claim* set up by his bill, we think it is conclusively disposed of by the chancellor, and for the reasons assigned in his opinion, in 4 *Md. Ch. Dec.*, 144, 145.

3rd. That the chancellor in decreeing in favor of the complainant, in reference to the *fourth item* of his claim, only asserts a right of contribution in his favor against *the other parties to the partition*, referred to in the decree, to make good to him a proportion of the loss which he suffered by reason of the liability of the Ferry Point lease-hold lot to the Gittings' claim, and while we may not be able successfully to controvert this principle of contribution, we deny, in accordance with our exceptions in the chancery court, that *such* a claim for contribution is embraced in the *averments of the bill*. But if the defendants are liable for *such contribution* under the bill, we further insist, their liability can only be to contribute to make good to the complainant, as owner of the Ferry Point lot, a portion of its value of $2500 under the partition, and only to the extent to which this lot was liable in the hands of complainant for the Gittings' claim; and that the defendants, who were parties to this partition, cannot be held liable for any contribution, until the whole personal estate of the testator, unadministered, and not specifically bequeathed, including the full amount of the *devastavit*, for which also the complainant, as *surety*, was responsible, is first applied in reduction of the amount paid to Gittings, and if any thing should then be due to the complainant on account of his payment, the parties to the partition should not be held to contribute to pay the same, until the Water street lease-hold lot, bequeathed to the complainant, and the other specific bequests which were equally liable with the Ferry Point lot for the Gittings' claim, shall be brought into contribution, and the defendants, Rebecca and Cordelia, can only be held liable for two-thirds of the amount thus finally chargeable against the Ferry Point lot, which two-

thirds, in no event, can exceed two-thirds of $2500, the value of the lot under the partition.

Under the appeal taken by the defendants we insist:

1st. That the decree of the circuit court was erroneous in misconstruing and disregarding the opinion of the chancellor, which was the *law of this case* until properly brought up for review by this court. When the cause was removed into the circuit court, that court was *bound* to follow the decision of the chancellor. 1 *Bland*, 57, *Strike's Case.* 2 *H. & G.*, 191, *Strike vs. McDonald.* 2 *Paige*, 413, *Townshend vs. Townshend.*

2nd. That this decree was also erroneous in asserting that the *real estate*, devised under the *residuary clause* of the will, was applicable to the payment of the amount paid by the complainant on the Gittings' claim, which was a *simple contract debt* of the testator, before and in exoneration of the lease-hold estate bequeathed to the complainant. And also in asserting, that all the real property embraced in the last clause of the will, including those portions devised by specific description, such as the reversion of the ground-rents and the lands in Baltimore county, should be first applied to refund to the complainant the amount paid on the Gittings' debt in exemption of the lease-hold property bequeathed to and acquired by the complainant, while even his bill admits the liability of his property for the whole amount of Gittings' claim, and only asserts that the real property, devised in trust for the respondents, "is equally chargeable" with this claim.

In discussing this point it is worthy of remark, that the *bill* only seeks *contribution,* and does not pretend that the real estate, in the hands of the devisees, is *primarily* liable to the *entire exoneration* of the specific legacies. Again, the legacies in the *fourteenth* clause of the will, in reference to which this contribution is asked, are general pecuniary, *demonstrative* legacies, *specific* in so far as they point out the fund from which they are to be paid, but *general* inasmuch as no *particular part* of the fund is appropriated to their payment, and *beyond* the fund demonstrated, they are mere general pecuniary legacies, payable out of the residue of the estate. *Smith on*

*Real Prop.*, 824, in 89 *Law Lib.*, 534. 3 *Richardson's Eq. Rep.*, 84, 85, *Hull vs. Hull. Ward on Legacies,* 370. *Powell on Devises,* 22 *Law Lib.*, 381. 1 *Roper on Legacies,* 153. 2 *Wms. on Ex'crs,* 994, 1540. In the case of *Chase vs. Lockerman,* 11 *G. & J.,* 202, the general principle, that the personal estate is the natural and primary fund for the payment of the *simple contract* debts, and that devised lands shall not *contribute,* with specific bequests, to pay such debts, is most distinctly recognized, while in that case the court held, that there was a right of contribution against devisees in favor of specific legatees to pay *specialty* debts. The cases of *Magruder vs. Carroll,* 4 *Md. Rep.,* 335, and *Alexander vs. Worthington,* 5 *Do.,* 471, cannot be considered as decisions adverse to the principle contended for, because in the *first* case the court say, they pass no opinion in regard to the primary liability of the negroes to the real estate in payment of the debts of the deceased; and in the *second,* that: "It will not be necessary to remark on the distinction supposed between the specialty and simple contract creditor; it is averred that Carroll died in debt for the land purchased by him after the date of the will, and independent of this averment, if the equity could have turned on the supposed distinction, the cause would have been remanded with liberty to the party to amend," thus expressly *waiving* a decision upon this point. The distinction set up in *Chase vs. Lockerman,* that the rule of contribution, between specific legatees and devisees, is generally confined to *specialty* debts, is recognized in numerous authorities. 1 *Story's Eq.,* secs. 564, 565, 570, 571. 2 *Powell on Devises,* 667, 668, in 22 *Law Lib.*, 356, 357. 2 *Spence's Eq.,* 839. 4 *Kent's Com.,* 421. 2 *Jarman on Wills,* 546, 547, 548, and *notes.* And that devised lands shall not contribute, with specific bequests, to pay such debts: See 9 *Grattan,* 549 to 554, *Elliott vs. Carter.* 5 *Barr.,* 356, *Hoover vs. Hoover.* 3 *Rawle,* 237, *Walker's Estate.* 2 *Dev. Eq. Rep.,* 173, *Robards vs. Wortham.* 3 *Murphy,* 194, *Miller vs. Harwell.* 18 *Ves.,* 138, *Tower vs. Ld. Rous.* 9 *Do.,* 453, *Watson vs. Brichwood.* 12 *Price,* 324, *Noel vs. Noel.* 1 *Brown's Ch. Rep.,* 454, *Ancaster vs. Mayer,* and authorities cited under

this case in *White's Eq. Cases,* in 65 *Law Lib.,* 442 to 449. 1 *Paige,* 190, *Rogers vs. Rogers,* and same case in 3 *Wend.,* 518. 1 *Comstock,* 122, *Hoes vs. Van Hoesen.* 3 *G. & J.,* 157, *Hoye vs. Brewer.* 4 *Do.,* 302, *Wyse vs. Smith.* 6 *Do.,* 444, *Griffith vs. Frederick Co. Bank.* 6 *Gill,* 316, *Cornish vs. Wilson.* Some of these authorities have followed the construction in favor of the *priority* of devisees which may be given to the fifth resolution in *Hazelwood vs. Pope,* 3 *Peere Wms.,* 324; and this preference of devisees was also maintained by the decision of the vice-chancellor, in *Cornewall vs. Cornewall,* 12 *Simons,* 303, but in England the law is now settled, in conformity with *Chase vs. Lockerman,* that specific devisees and legatees shall equally contribute to the payment of *specialty* debts. 2 *Collyer,* 505 to 509, *Tombs vs. Roch.* 1 *Jones & Latouche,* 466, *Young vs. Hassard.* 14 *Simons,* 654, *Gervis vs. Gervis.*

It must be borne in mind that this is the case of a specific legatee, who has received his legacy through a *devastavit* of the executor, and who has subsequently been obliged, under legal proceedings, to pay a simple contract debt of his testator, for which his legacy was liable, in the hands of the executor, and who now claims, from devisees of the land, contribution for such payment, while neither the legacy so liable, nor any bequest in the will, nor the debts of the testator, are *charged* on the specific or residuary devises. *Stevens vs. Gregg,* 10 *G. & J.,* 147, and numerous authorities which might be cited, are clear to the point, that a mere charge of land with debts or legacies, will not ordinarily disturb the primary liability of the personalty, for their payment. The authorities are also clear, that every devise of land is specific. *Ambler,* 173, *Forrester vs. Leigh.* 1 *Peere Wms.,* 679, *Clifton vs. Burt.* 5 *Ves.,* 359, *Keeling vs. Brown.* 7 *Do.,* 147, *Howe vs. Ld. Dartmouth.* 1 *Ves. & Bea.,* 174, *Hill vs. Cock.* 2 *Mylne & Craig,* 705, *Mirehouse vs. Scaife.* 2 *Wms. on Excrs.,* 847. The court below misconstrued the case of *Spong vs. Spong,* 1 *Young & Jervis,* 300, and 3 *Bligh,* 84, which certainly cannot be considered authority for the point, that "a residuary devise of real estate is not a specific devise," and

still less for the proposition that residuary real estate of a testator is the proper fund to be resorted to for the payment of debts, after exhausting his personal estate not specifically bequeathed, and in exoneration of specific bequests. That case, as decided in the House of Lords, is only an authority that an express *charge of legacies,* such as that contained in that will, must be construed a *charge* on the *residue alone,* in exemption of the specific devises and bequests. See, on this case, 2 *Jarman on Wills,* 530. 1 *Jones & Latouche,* 471, *Young vs. Hassard. Sugden on Property,* in 64 *Law Lib.,* 290 to 293.

3rd. That the decree was further erroneous in deciding that the complainant is entitled to an account against the *administrators de bonis non* of Cumberland Dugan, for the amount in their hands, while the defendants contend this is a claim only cognizable in a court of law.

4th. And also in deciding that the complainant was not, under the facts and circumstances of this case, *primarily* liable for the *devastavit* of his mother, as executrix; and in contending for the primary liability of the complainant, the defendants insist that the *devastavit* is not to be measured by the amount of the judgment confessed, but to this there should be added the amount of the loss upon the Franklin bank stock, which the testator directed to be sold *"as early after his* demise as practicable."  And that as the amount of the *devastavit* alone exceeded the balance of the Gittings' claim paid by the complainant, there was thus no proper legal liability of the leasehold lots bequeathed, or the realty devised for the Gittings' claim. 2 *Wms. on Excrs.,* 1283, 1285. 1 *Salk.,* 153, *Anon.* 5 *Ves.,* 736, *Omerod vs. Hardman.* 11 *Wend.,* 364, *Schultz vs. Pulver.* 3 *Myl. & Cr.,* 496, *Clough vs. Bond.* 6 *G. & J.,* 445, *Griffith vs. Frederick Co. Bank.*

5th. That in this proceeding the complainant cannot make *Margaret Dugan's representatives* liable for any *devastavit,* even if she should be considered primarily liable therefor, because such liability is properly cognizable in a court of law, but if cognizable in this court, then the defendants insist that the complainant is, under the circumstances of this case, estopped from setting up such a claim.

6th. That in this proceeding the complainant cannot make the representatives, or the estate of *Hammond Dugan,* responsible for any part of the *devastavit,* as such a claim is properly cognizable in a court of law; but if cognizable in this court, then the defendants insist that the complainant is, under the circumstances of this case, estopped from setting up such a claim. There is no evidence of the insufficiency of the personal estate of Mrs. Dugan to pay the amount of the *devastavit,* and no part of it can, therefore, be charged against the *sureties* on her bond.

7th. That the decree was erroneous in decreeing an immediate sale of the property therein mentioned, for the payment of *the balance* of the payment to Gittings, after the application of the personal estates of Cumberland and Margaret Dugan, instead of waiting until such balance should be ascertained by the auditor.

8th. If the principles of the decree of the circuit court should be sustained by this court, the defendants, Hollins of Rebecca, and Hollins of Cordelia, will then set up a claim against the complainant as devisee under the residuary clause, to make good to them the value of the house taken from them, as specific devisees thereof, by reason of the claim of Gittings, under the contract mentioned in the case of *Dugan vs. Gittings,* against their testator, together with interest on such value from the death of their grandmother, which claim is set up by them in their answers, but entirely disregarded in the opinion and decree of the circuit court.

9th. If this court should hold that the complainant is entitled to contribution from the defendants and Hammond Dugan, as devisees of the realty, on account of the payment by complainant of the Gittings' claim, the defendants will deny that such contribution should extend to affect any portion of Hammond's land acquired by them under the partition thereof, but if any land so acquired should be held liable to such contribution, the defendants will then contend that such liability must be subject to the claim of the owner of the land so held liable against the complainant, as one of the parties and covenantors to the partition, for indemnity for a portion of such

10    v. 11.

liability. 4 *Kent's Com.*, 475. 2 *Hilliard on Real Property*, 360. 9 *Gill*, 19, *Morris vs. Harris.*

BARTOL, J., delivered the opinion of this court.

Before considering this case on the merits, it is necessary to dispose of a preliminary question, involving the appellant's right to have the chancellor's order, of the 26th of January 1854, reviewed on his appeal.

It appears that the complainant, in his bill, asserted four items of claim. The chancellor, in his opinion filed with the above mentioned order, examined them all, and disallowing the *first three*, passed an order referring the case to the auditor to state an account in relation to the *fourth*. Before the account was taken, or any thing further done in the cause, the proceedings were removed, on the 7th day of March 1854, to the circuit court for Baltimore city, under the act of 1853, ch. 123; and the complainant, in that court, entered his appeal from the decree of January 1854, on the 26th day of May of that year. Further proceedings were then had, and the circuit court, on the 5th day of July 1855, passed a decree for the sale of certain property, to satisfy the *fourth* item of the complainant's demand. The complainant appealed from that decree on the 29th of September 1855. The record was filed here on the 23rd of November 1855, within nine months from the date of the complainant's last appeal; but after the lapse of that time from the 26th of May 1854, when the complainant's first appeal was entered.

The objections taken, on the part of the defendants below, to the complainant's appeal are, 1st, that he had no right to appeal at all, from the chancellor's decree, after the cause had passed to another tribunal; 2nd, that if the appeal was well taken, the record should have been transmitted within nine months from the entry of the appeal, the order appealed from being *final* in its character, as to the three rejected claims; and 3rd, that the court cannot, under the appeal of September 1855, review the proceedings as to the rejected claims.

It is, doubtless, true, that generally an appeal must be entered in the court where the judgment or decree is passed. In

most cases it can be entered nowhere else.   But here the question is, how far this general doctrine has been modified by the acts authorising the removal of causes from one jurisdiction to another.   This court has said, in *Brown vs. Gilmor*, 8 *Md. Rep.*, 322, that where a cause is removed, under the act of Assembly, the jurisdiction of the *chancery court* passes to the *circuit court*, as if no removal had taken place.   It must be considered as a continuance of the same cause.   This is a fair interpretation of the acts, and of the design of the legislature in passing them.

The act of 1826, ch. 200, gives the right of appeal; the legislature did not mean to take away that right, by authorising the removal of causes.   The object was not to hinder, or delay, or restrict remedies, but to promote the ends of justice; the acts not reserving expressly, yet not taking away any right which suitors would have enjoyed, if the case had not been removed.   If the construction were otherwise, the party obtaining the decree might, by causing the papers to be transmitted to another court, immediately after the decree, cut off the opposite party's right of appeal altogether.   Surely the law was not designed to produce such consequences, and a construction that may lead to this injustice cannot be adopted.

The first ground of objection, on the part of the appellees, being insufficient, and the appeal of May 1854 being in time, we are to inquire, *secondly*, how the filing of the record here, after the expiration of nine months, affects the question.   And this point, we think, must be ruled against the appellees, upon the authority of *Hannon vs. Robey*, 9*th Gill*, 440, it not appearing that the appellant is in default.

The propriety of the decree of January 1854 being properly before us, on the appellant's first appeal, and there being no question as to the other, it is unnecessary to decide whether that decree is such a one as, under the acts of Assembly, could be reviewed upon the complainant's appeal of September 1855.   We proceed, therefore, to consider the questions presented by the record, upon the pleadings and proofs, under the appeals of both complainants and respondents.

The bill filed in this cause, by Frederick J. Dugan, the ap-

pellant, seeks to recover certain sums of money alleged to be due to him in the two-fold character of *legatee* of Cumberland Dugan, and as creditor, by subrogation to the rights of John S. Gittings, who had recovered a decree for the amount of a simple contract debt due him from the testator; the complainant having paid the balance due on said decree, and taken an assignment thereof, on the 18th day of February 1847.

Four distinct claims are presented by the complainant :

1st. As *legatee* of the sum of $13,750, chargeable on the *bank stock and other stock* of the testator, under the 14th clause of the will, with interest thereon.

2nd. As representative of Hammond Dugan, deceased, for *one-third* of legacy of the same amount given to him by the same clause of the will; said Hammond having devised all his estate and property to his mother, Margaret Dugan, and she having conveyed the same, by deed dated the 25th day of March 1841, to the complainant and his two sisters, Rebecca and Cordelia M. Hollins, in equal proportions.

3rd. For *one-fourth* in his own right, and *one-third of one-fourth*, under Hammond Dugan, of payments made by the testator, as security of Robert and John S. Hollins, under the 15th clause of the will.

4th. For *two-thirds* of the sum of $9772.31, with interest from the 18th of February 1847, being the amount paid by complainant on the decree in favor of John S. Gittings and others, as admitted in statement of facts filed the 8th of June 1853.

We shall first dispose of the *third* item of the complainant's claim, by simply remarking that we concur with the late chancellor, in the construction of the 15th clause of the will, on which it is founded; and, for the reasons expressed in his opinion of the 26th of January 1854, we think that item of claim must be disallowed.

To determine the equitable rights of the complainant upon the other items of his claim, is somewhat more difficult. We have given them our most careful and anxious consideration, and believe that the difficulty in arriving at clear and satisfactory conclusions on the questions involved, arises from the com-

plex relations which the parties bear to each other, and to the several funds sought to be charged, rather than from any uncertainty in the legal principles on which they depend.   These are plain and well established, and a brief statement of them at the outset will aid us in arriving at the equitable rules which govern the case.

1st. It is clear that the legacies given to the complainant and Hammond, by the 14th clause of the will, are not to be treated as mere *general pecuniary* legacies.   They are what are called *demonstrative* legacies, not strictly specific, but in the nature of specific legacies; that is to say, to the extent of the value of the fund or property on which they are chargeable, (when that does not exceed the amount of the legacy,) they are to be treated, in some respects, as *specific;* liable to abate with specific legacies in the payment of debts, and entitled to contribution from them, if the fund demonstrated has been so applied, to the exemption of specific legacies.   See 1 *Roper on Legacies,* 224, 237, 363, 364, *(edition of* 1848,) 2 *Wms. on Ex'crs.,* 995, 1174, *(edition of* 1849,) and the cases cited by those authors.   The conclusion from these authorities is, that as the stock on which these demonstrative legacies were charged, has been applied to the payment of debts, the legatees are entitled to a ratable contribution from all the specific legacies which have not been so applied.

2nd. This court considers the law as settled in Maryland, that if there be sufficient personalty for the payment of debts, a *simple contract* creditor cannot resort to the *realty* for payment, when the realty is devised, and is not charged with the debts.

3rd. If a specific legacy be taken for the payment of a *simple contract* debt, while the legatee would be entitled to contribution from other specific legacies, he cannot charge with contribution the *real estate* which is devised.

These last two rules were expressly recognized and asserted by the Court of Appeals, in the case of *Chase vs. Lockerman,* 11 *G. & J.,* 185, decided sixteen years ago.   That case has not been impugned, as was argued at the bar, by the decision in *Alexander vs. Worthington,* 5 *Md. Rep.,* 471; and has so

long been considered as established law in Maryland, that this court is not disposed to disregard its authority.

Now let us apply these rules to the case before us. It is obvious that inasmuch as the debts, to the payment of which the demonstrative legacies have been applied, were *simple contract* debts, the complainant is not entitled to subject any of the *real estate* of Cumberland Dugan to contribution for the payment of any claim which may be due him as *legatee.* Nor is any portion of said real estate (the same having all been devised) liable for any claim of the complainant *as creditor,* until after the whole personal estate, including the legacies, shall have been exhausted.

If, upon a proper account being taken, it shall appear that the whole personal estate of Cumberland Dugan, specifically bequeathed, and the bank and other stocks, with the dividends thereon, charged with the demonstrative legacies, be more than sufficient to pay all the balance of the debts due and owing by him, after first applying to such payment the general assets, then the complainant will be entitled to ratable contribution from the specific legacies on his one-half of said demonstrative legacy, and on the one-third of said Hammond Dugan's half of the same legacy, estimating said demonstrative legacy not at the sum named in the will, but at the amount of the actual value of the stock pledged for its payment, and the dividends thereon, and in this case such value is the price for which the stock was actually sold.

In estimating such contribution, the same must be charged ratably on each parcel of personal property specifically bequeathed, including the lot of ground on Water street, given to the complainant himself, and the specific legacies given to Margaret Dugan, the mother, except that if it shall appear that the whole assets exceed the whole amount of debts due by the estate, and the expenses of administration, the one-third of such excess would belong absolutely to the widow, as purchaser. See 10 *G. & J.,* 113.

And in charging such contribution on the personalty specifically given to her, such sum so ascertained as belonging to her absolutely, must first be deducted from the amount of her

specific legacies, and the residue thereof, only, is liable to contribution. And inasmuch as all the specific legacies of Margaret Dugan, including the Ferry Point lot, have passed to the complainant and his two sisters, Rebecca and Cordelia, in equal proportions, and in the same proportions they represent the said Hammond's interest in the demonstrative legacy, the several contributions chargeable on said specific legacies must be apportioned between them in like proportions, and the value of the two lots, above mentioned, is to be determined by their appraisement in the inventory.

By the application of these rules the rights of the complainant, in respect to the first and second items of his claim, may be ascertained. These principles are necessary to be decided, in order to adjust the accounts between the parties, although it may appear that the complainant has already received, as specific legatee, more than he is entitled to, in that character, under the will.

The principles already stated, will also indicate the mode in which the complainant's claim as creditor, under the assignment from Gittings, is to be ascertained and adjusted.

The amount paid by him to Gittings was $9772.31, and that sum, with interest from the 18th of February 1847, constitutes the basis of the fourth item of complainant's claim.

This court concurs in the opinion of the judge of the circuit court, that the whole balance of the personal estate of Cumberland Dugan, remaining unadministered, is first applicable to the payment of this debt. This balance consists of two items:

1st. The sum remaining in the hands of the administrators *de bonis non*, which is admitted to be $260.92. For that sum they are liable to the complainant in this suit, with interest thereon, from the 10th day of January 1849; their accounts showing that the same has been in their hands since that time, and that no interest has been charged thereon.

2nd. The sum for which Margaret Dugan, the executrix, is chargeable for *devastavit;* and it is necessary to determine the amount of such *devastavit.*

It has been contended, in the argument, that she is justly

chargeable with the loss which occurred by reason of the depreciation in the value of the Franklin bank stock, on the ground that she was guilty of laches and neglect in not selling the same, according to the directions of the will.

We do not concur in that view; the record shows that letters testamentary were granted to her on the 3rd day of December 1836; that on the 3rd day of January 1837, the suit of John S. Gittings and others was instituted, claiming large sums of money from the estate. There was certainly no breach of duty by the executrix in retaining the stock unsold, to await the determination of that suit.

It does not appear that the stock was considered an unsafe investment; large dividends accrued and were received thereon, and there is no evidence in the cause of any ground for apprehension of loss, until the sudden failure of the bank, which occurred as early as January 1841, before the final determination of the suit of Gittings.

Besides, the respondents, who were interested as residuary devisees and legatees, had a right, at any time, equally with the complainant, to compel a sale of the stock, by instituting proper proceedings for that purpose.

All the parties interested, however, stood by without taking any action to enforce a sale.

For these reasons this court considers that there was no *devastavit* by the executrix in her omission to sell the bank stock, and the accidental depreciation in its value.

We are of opinion that the *devastavit* chargeable upon the executrix, is to be measured by the amount of the judgment recovered against her and her sureties, amounting to the sum of $4710.21, with interest from the 4th of June 1846. We are also of opinion that the said judgment for *devastavit* cannot properly be charged, for any part of it, against the sureties of said executrix. It is very evident, from the proofs in the cause, that her individual estate was ample to pay the amount of the *devastavit*, and as it does not appear that any part of it was collected by the administrators *de bonis non*, and as all her property, which was chargeable therefor, passed to the complainant and his two sisters, Rebecca and Cordelia, in

equal proportions, the said *devastavit* ought to be charged, in equal proportions, to the said complainant and his said two sisters, to the exoneration of the sureties. One-third, therefore, of the said judgment for *devastavit* is to be deducted from the said claim of the complainant.

After applying to the payment of the said Gittings' debt the said balance in the hands of the administrators *de bonis non*, and the one-third of the amount of said judgment for *devastavit*, the balance of said debt is chargeable on the *personal* estate, only, of Cumberland Dugan, deceased; and for its payment the several legacies must contribute their just and ratable proportions.

Without reversing or affirming on either of the appeals, we remand the cause for further proceedings, under the act of 1832, ch. 302.

*Cause remanded.*

NOTE.—The Reporter has been requested, by the Judges who decided this case, to state, that the court is not to be understood as intimating any opinion on the question, whether if a demonstrative legacy be taken for the payment of *specialty* debts, the legatee would be entitled to claim contribution from the realty, in the same manner as a specific legatee? This question does not arise in this case, and the court expresses no opinion thereon.