(Decided 26th January, 1882.)

---

ELIZABETH C. CLASSEN *vs.* HERMAN CLASSEN.

*Bill filed by a Wife to have a Marriage Contract set aside on the alleged ground, that she never signed or acknowledged it—Certified Copy of the Recorded Contract, Evidence—The Wife a Competent Witness under the Act of 1864, ch. 109, and its Supplements—Failure of Proof on the part of the Wife.*

The appellee and the appellant lived together as man and wife for some years before 1870, when they were legally married; a marriage contract was executed some two and a half years before the ceremony of marriage, by which contract each of the parties relinquished all marital rights in the property of the other; the contract was acknowledged and duly recorded in Baltimore City and Baltimore County. In 1879, the wife filed a bill to have the paper, purporting to be a marriage contract, set aside, on the alleged ground that she never signed or acknowledged it, and accidentally discovered its existence some time after her marriage in 1870. The original paper was lost, but a certified copy from the records, signed by the wife, and acknowledged before a justice of the peace, was filed with the bill. HELD :

That this copy was *prima facie* evidence of the genuineness of the instrument, and that the burden of proof was upon the complain-

ant, to show it was not her act and deed; that she was a competent witness under the Act of 1864, ch 109; but that her evidence, flatly contradicted in every material part by that of the husband, did not sustain the allegations of her bill.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ALVEY, ROBINSON, IRVING and RITCHIE, J.

*George Hawkins Williams,* for the appellant.

*L. M. Reynolds,* and *S. T. Wallis,* for the appellee.

ROBINSON, J., delivered the opinion of the Court.

This is a bill by a married woman to set aside a paper, purporting to be a *marriage contract,* which she alleges was never signed or executed by her.

The original paper appears to have been lost, how, or in what manner, the record does not disclose. A certified copy, however, signed by the complainant, and acknowledged before a justice of the peace, and duly recorded, is filed with the bill. Being a copy of a paper required by law to be recorded, it is *prima facie* evidence of the *genuineness of the instrument;* and the burden of proof is upon the complainant to show it is not her act and deed. *Crawford vs. State,* 6 *H. & J.,* 234; *Barry vs. Hoffman,* 6 *Md.,* 78; *Warner vs. Hardy,* 6 *Md.,* 537; *Hutchins vs. Dixon,* 11 *Md.,* 41.

The proof in this respect, rests mainly upon her own testimony, and as this is a *civil proceeding,* she is, under the Evidence Act of 1864, ch. 109, and its supplements, a competent witness. *Turpin vs. State,* 55 *Md.,* 462.

Coming then to the proof, it appears that the complainant first became acquainted with the defendant, sometime

in the year 1865.  She had been divorced from her former husband, and was then about thirty-four years of age, and he a widower of sixty.  Soon after their acquaintance, she went to live with him, as she says, under a contract of marriage, *per verba de præsenti,* a contract, it is but proper to say, unknown to the laws of this State.  Be that as it may, they did cohabit together as man and wife, the defendant introducing her to his friends, sometimes as his wife, Mrs. Classen, and at other times, as Mrs. Stonesifer, her maiden name, until 1870, when they were lawfully married.

The marriage contract now assailed, was executed in December, 1867, and recites, that in consideration of a marriage intended to be had and solemnized between the parties, they each agree to renounce all marital rights in the property of the other.

This instrument, the complainant alleges, she never signed, and never knew of its existence, until 1870, when it was found, according to her testimony, in the following manner:

"After we moved into town in the fall, into the house where we now live, Mr. Classen changed his desks one day, he laid his papers upon the table; he told me to put the papers away into the other desk, when I found this marriage contract, and I saw my name was upon it." Annoyed and worried, she says, at finding such a paper, which she had not signed, she communicated the fact to her husband, and this gave rise to an angry dispute, the particulars of which it is unnecessary to state.

She then took the paper to Mr. Reynolds, a lawyer, and what passed between them, being a privileged communication between client and counsel, does not appear ; Mr. Reynolds however, does say, the first time he ever heard that the paper had not been signed by her, was after the institution of this suit, and this was nine years after she had consulted him about it.  Now, if her signature

was a *forgery*, we are at loss to conceive, why a fact so vital to her interests, should have been withheld from the very counsel whose advice she had sought. She had consulted him for the sole purpose of protecting her rights as a wife against this fraudulent contract, and if her signature to it was a forgery, it is asking rather too much of one to believe, that she would not have said so at the time. Then what follows? Shortly after this interview with Mr. Reynolds, her husband by deed of December 30th, 1870, conveys certain ground rents amounting to $380 per annum in trust for her support and maintenance, in the event of her surviving him. This is signed by her and recites the *due execution of the marriage contract*, which she now says was never signed by her. She admits the execution of this deed of December 30th, but says her husband promised to convey to her ground rents to the amount of $700, and she thought the deed so provided, and did not know to the contrary until several weeks after its execution.

It thus appears, that the existence of this marriage contract was known to the complainant as far back as 1870; that upon its discovery she had taken it to a competent lawyer, in order that her rights as a wife might be protected, without even intimating to him, that the signature to it was not her genuine signature; that shortly afterwards, she joins in the execution of a deed, in which the execution of the contract is recited; and that from that time until the institution of this suit, a period of *nine years*, no steps are taken by her to assail it. Her whole conduct from the beginning to the end seems to us, to be inconsistent with the improbable story she now tells.

As to the evidence of the justice of the peace, it does not strike us as being entitled to much weight one way or the other. The paper was acknowledged in 1867, and he is not examined as a witness until 1880, *thirteen years*

Classen *vs.* Classen.

intervening. The parties were unknown to him, and the original paper has been lost. That he should not remember anything about its execution, or be unable to identify the parties, is not under such circumstances surprising.

In the argument at bar, much stress was laid upon the failure on the part of the defendant to produce the original contract; and had it been traced to his *exclusive possession*, his failure to produce it, or to have accounted satisfactorily for its loss, would have been a very suspicious circumstance. But it was kept in a place to which the complainant and others had access, and where in fact she found it. What became of it afterwards does not appear. The defendant says he missed it, and upon inquiry, the complainant told him his son " *Ben* " had been there, and may perhaps have taken it. In view of these facts, we have not attached much significance to the failure of the defendant to produce it.

As we have said before, the complainant's case rests mainly on her own evidence, in every material part of which she is flatly contradicted by the defendant. All the facts and circumstances which led to the execution of the paper and its acknowledgment before the justice of the peace, and the motives which governed him in the execution of the deed of December 30th, providing for her support, are fully stated by him. There is no reason, so far as this record discloses, why his testimony should not be entitled to as much credit as that of the complainant. And this too, independent altogether of the evidence offered by him to support his character for *truth and veracity*, in regard to the admissibility of which we are not to be understood as expressing any opinion.

For these reasons the decree below will be affirmed.

*Decree affirmed.*

(Decided 27th January, 1882.)