HYDE *v.* STATE

[No. 202, September Term, 1961.]

210

212

*Decided March 28, 1962.*

The cause was argued before HENDERSON, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Harris James George* and *John W. Hessian, III,* for the appellant.

*Robert S. Bourbon, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Frank H.*

*Newell, III, State's Attorney for Baltimore County,* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

Appellant was found guilty of murder in the first degree in the Circuit Court for Baltimore County by a trial judge, sitting without a jury, and, after being sentenced to life imprisonment, has appealed.

On December 20, 1960, at about 10:15 a.m., Dolores Allan was found dead, lying on the floor of her home on Baltimore Street in Baltimore County. The cause of death was stab wounds in her chest and back. The appellant, who. lived a short distance down the street from the deceased, had been observed rapping on the Allan door at about 8:45 a.m. by the deceased's next-door neighbor. He did not gain admission into the home at this time, but the same witness saw him again at about 10:00 a.m.; this time he was coming out of the Allan home. Another neighbor, Susana Thatcher, "heard a bump" at approximately 9:45 a.m., and upon looking out her front door, saw the appellant coming down the Allan walk. Very shortly thereafter, a young child of the deceased came to the Thatcher home; "he was covered with blood." Jean Barello, another neighbor, upon being summoned by Mrs. Thatcher, carried the boy back to his house, and found his mother lying on the floor in a large pool of blood, with a piece of furniture on top of her. Acting upon information received from the neighbors, the police called upon the appellant at his home, arriving there around 10:30 a.m. As a result of what the neighbors and the appellant told the police and of finding blood-stained clothing in an automatic washer in the basement and also a sharp-pointed knife, the appellant was arrested and taken to the Essex Station. More facts will be added, when necessary, in dealing with the contentions made by the appellant.

I

The first question posed by appellant's counsel in their brief is a claim that the appellant was legally insane at the time the offense was committed. The question of whether the

mental capacity of an accused is sufficient to establish responsibility for criminal offenses is a mixed one of law and fact. The test to be applied in measuring the mental capacity and the degree of proof essential to establish such capacity are questions of law, but weighing the evidence and determining whether a defendant has the mental capacity required by such test is one of fact. In the instant case, the court applied the test of mental capacity that was held to be the proper one in the recent case of *Armstead v. State,* 227 Md. 73, 175 A. 2d 24. He also found that he was convinced of the appellant's sanity beyond any reasonable doubt. Cf. *Thomas v. State,* 206 Md. 575, 587, 112 A. 2d 913; *Lipscomb v. State,* 223 Md. 599, 604, 165 A. 2d 918.

Of course, there is a presumption that persons are sane and responsible for their acts at the time an offense is committed. *Lipscomb v. State, supra.* At the trial below, three psychiatrists testified: two were of the opinion that the appellant was a responsible agent at the time the offense was committed; one had an opinion to the contrary. He agreed that the accused was sane at the time of trial, but not when Mrs. Allan was killed. It would unduly prolong this opinion to set forth their testimony at length. Suffice it to say that after a careful reading of their testimony and due consideration of the reasons given by them for their conclusions, we cannot say the trial judge was in error in his finding, much less "clearly erroneous." Maryland Rule 886 a.

An unusual situation is presented under this heading. As we have just pointed out, appellant's counsel presented, in appellant's brief and at oral argument, the question of mental incapacity. However, they also present in the brief a "point raised at [the] express direction of defendant" to the effect that the issue of mental capacity had been raised by defense counsel (trial counsel was different from counsel on appeal) "without consultation with defendant" and "with full knowledge that Clifton T. Perkins Hospital had pronounced [appellant] sane." Whether trial counsel, under certain circumstances, have the right to interpose a plea of insanity in a criminal case contrary to the wishes and instructions of the de-

fendant presents a rather interesting question,[1] but we are not called upon to determine it here, since we have already held that the trial court's finding of appellant's mental capacity was correct.

## II

The appellant next raises the contention that the evidence, even though it discloses a killing by the defendant when he was sane, fails to show premeditation, which is required by Code (1957), Article 27, § 407, to sustain a conviction of first degree murder. He does not question the fact that the homicide was wilful and deliberate, apparently due to the severity and deadly nature of the wounds inflicted. This means that appellant does not deny that he had a specific design to kill (wilfulness) and that he had a full and conscious knowledge of a purpose to kill (deliberation), but contends that he went into a "rage"; that he had no motivation to murder the deceased; that his "mental posture," causing effects substantially similar to drunkenness or heat of passion, "might necessarily negate premeditation."

"Premeditated" means that the killing must have been meditated, planned in the mind, beforehand; that the design to kill must have preceded the killing by an appreciable length of time, time enough to deliberate; and in order to justify a conviction of first degree murder, the trier of facts must find the actual intent (wilfulness), the fully formed purpose to kill (deliberation), with enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper (lack of deliberation and premeditation), but that the mind has become fully conscious of its own design. Although the design to kill must precede the killing by some appreciable length of time, that time need not be long. If the killing be not the instant effect of impulse, if there be hesitation or doubt to overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated

---

1. Compare the recent case of Tremblay v. Overholser, 199 F. Supp. 569 (U.S. D.C., D.C.).

murder. *Cummings v. State,* 223 Md. 606, 165 A. 2d 886; *Faulcon v. State,* 211 Md. 249, 126 A. 2d 858; *Dunn v. State,* 226 Md. 463, 174 A. 2d 185; *Chisley v. State,* 202 Md. 87, 106, 95 A. 2d 577. And the question of premeditation must be determined by the facts of each particular case. *Cummings v. State; Chisley v. State,* both *supra.*

We have little difficulty with the question. In addition to the other evidence that we have outlined above, the defendant himself testified that he took a morphine tablet and went to the home of the deceased early in the morning of December 20 "with expectations." The evidence further disclosed that the victim had been stabbed four times: once in the chest and three times in the back. Three of the stab wounds penetrated to a depth of four and one-half inches; one, entering the back, went completely through her lung and cut a slit in the aorta. The trial court did not have to accept the appellant's fantastic fairy tale to the effect that when he started upon his early-morning, amorous journey, "with expectations," he took his trench knife with him, so that in case the deceased "had been kidding," he would take a trip to the woods to "track rabbits." The carrying of this knife, under all of the surrounding circumstances, including the facts that he had conversed with the victim but once and she had merely invited him "to drop down for a visit" (if, in fact, she did actually invite him—he was in the house but a few minutes and, apparently, never sat down), supports a rational inference that he intended to intimidate her with it, if she did not comply with his expectations, or that if she resisted his advances and made an outcry, as she did, he could quell the alarm with it (this latter is confirmed to a degree, by the fact that he also stabbed her tiny child, who was crying and making considerable noise, to a depth of one and one-half inches). This inference negates the notion that the killing was the offspring of rashness or impetuosity, or that it was the instant effect of impulse. And the nature and number of the deadly blows and the time necessarily required for their infliction amply support a finding that appellant had time for premeditation. We have stated there were four deep stab wounds; one in the front chest (four and

one-half inches deep), and three in the back. The pictures show that the victim was lying face down when her body was discovered. From this, it is reasonable to infer that the wound in the chest was inflicted first, and after she had fallen to the floor, the additional, savage thrusts were made in her back.

In addition, there is a tiny word in his statement that has significance, as bearing upon premeditation. He said: "She told me to stop and leave, in a semi-loud tone. I was getting mad * * * and re-demanded an explanation, approaching her. She looked like she was frightened and mad, and started to yell, 'get out,' 'go,' 'no,' * * *." After her admonishments to "get out" and to "go" while he was advancing toward her, the trial court could rationally infer that her frightened look was caused by his menancing attitude in approach, and the final "no" probably was a last-minute, earnest entreaty not to inflict the first wound. This also tends to negate any contention that the fatal blows were the "instant effect of impulse."

We hold the evidence was sufficient to support a finding of premeditation by the trial judge.

### III

This brings us to the appellant's third assignment of error. In his brief, he states that the "refusal of the police to obtain for [him] the counsel he requested and their failure to advise him of his right to remain silent violated [his] right to due process of law," and therefore he "is entitled to a reversal because his constitutional right to due process of law was violated." It will be noted that no specific mention of any confession, plea, waiver, or other event prejudicial to the accused is made, *Crooker v. California,* 357 U. S. 433, 440, but he suggests that the failure of the police to obtain counsel for him and to notify him that he did not have to answer questions effectuated an absolute bar to his conviction. The first part of this proposition was presented to, and rejected by, the Supreme Court in *Crooker v. California, supra,* on the ground that "such a doctrine would create a complete anomaly * * *." We are not only bound by this ruling, but also agree with it. And there is no rule in this State that proscribes the questioning of persons suspected or accused of crime, without first

informing them that they do not have to answer the questions. Cf. *Culombe v. Connecticut,* 367 U. S. 568, 6 L. ed. 2d 1037, 1057. If the contention now under consideration stood alone, we would elaborate upon it more fully, but we, in effect, do so in what follows immediately.

In oral argument, appellant's counsel attempted to add to this contention in their brief by stating that under their due process argument they not only attack "the voluntariness of [appellant's] written confession, but also the admissibility of the verbal admissions" made after the appellant had stated he would say no more until he obtained counsel. The argument fails for several reasons. Maryland Rule 831 (subsections c 2, and c 4) provides that appellant's brief shall contain "a succinct statement of the questions presented separately numbered," and "argument in support of the position of the appellant." Appellant's brief contains neither in respect to the matter now under consideration, and we have held that a question not presented or argued in appellant's brief was not before the Court of Appeals, although it was brought to the attention of the Court during argument. *Comptroller of Treasury v. Aerial Products, Inc.,* 210 Md. 627, 124 A. 2d 805. See also *Baxter v. State,* 223 Md. 495, 165 A. 2d 469 and *Mullan v. Mullan,* 222 Md. 503, 161 A. 2d 693. And even constitutional rights may, ordinarily, be waived by failing to comply with procedural requirements to preserve the right to appellate review. *Shorey v. State,* 227 Md. 385, 389, 177 A. 2d 245, and cases cited therein; *Yakus v. United States,* 321 U. S. 414, 444. This is but one of the reasons why this particular argument fails.

Next, Maryland Rule 828 b 1 provides that the printed extract "shall contain such parts of the record as may reasonably be necessary for the determination of the questions presented by the appeal." The written confession, the one whose admission is now most objectionable to the appellant, is not included in the record extract (we took it from the transcript). It is clear that the terms of an admission or confession are "necessary" to determine whether such statements are, in fact, admissible, and if erroneously admitted, whether they were prejudicial.

In addition, the evidence shows that the appellant, at the time of the killing, was a man twenty-one years of age, who was a high school graduate and had served four years in the United States Air Service. He was identified by two of the victim's neighbors as the man they saw coming out of the Allan home at about 10:00 a.m. The body of the deceased was discovered around 10:15 a.m., and by 10:30 a.m., Sgt. Hohman and Officers Gietka and Maenner knocked at Hyde's door and were admitted into the house. Hyde, who lived with his mother, was wearing a bathrobe and slippers. Gietka testified that Hohman asked Hyde what he was doing, and he replied that he was washing clothes. Upon going to the basement, they found an automatic washer in operation, inside of which, and on the outside, was clothing which appellant *testified* he was wearing when he left the Allan home a few minutes before. Hohman asked Hyde if he had been at the Allan home and he said, "yes." Whereupon, he was informed that he would have to go to the police station at Essex. At 10:45 a.m., Officers Gietka and Sizemore took Hyde to the station. They went to the sergeant's room, where he told these officers (no one else was present) that he was in the home of Mrs. Allan around 9:25 a.m. and had done "something wrong," but would not state what it was. When additional questions were asked, Hyde said he'd like a little time to think it over and "he'd rather not say anything until he got some legal advice." Officer Gietka stated that neither he nor Sizemore was requested by Hyde to obtain a lawyer for him, and they made no effort to do so. Thereafter, Hohman came in and Gietka questioned the defendant no further. The appellant requested water, which was given to him, and at lunch time, he was given food and coffee. From his arrest down to and during this questioning, he was brought into contact with no other officers than the four named above, and the whole interview with the two officers lasted about two hours.

Officer Sizemore, among other things, corroborated the statement made by Hyde in the sergeant's room that he had been to the Allan home at about 9:30 a.m. and had "done something wrong"; also that appellant was given food and water.

He estimated that they were in the sergeant's room for an hour to an hour and one-half. The appellant never said anything, in his presence, about wanting to contact his parents, nor did he ask for counsel, but did state that he would say no more "until he saw—he would like to have legal advice."

An expert from the F. B. I. testified that there were spots of human blood on the jacket found in Hyde's basement in and around the right pocket, as well as elsewhere.

Lt. (formerly Sgt.) Hohman testified he arrived at the Allan home around 10:17 a.m. A short time thereafter, Gietka beckoned to him to come down to what turned out to be the Hyde home. Hyde was standing in the front door, and appeared to be very nervous. Among other things, Hohman corroborated the fact of finding the clothes, and that Hyde said he had been in the Allan home that morning for about ten minutes. He then ordered Gietka and Sizemore to take Hyde to the Essex station, where he joined them around 12:45 a.m., finding Hyde, Gietka and Sizemore in the sergeant's room. He asked Hyde would he like to tell what happened "up the street" that morning, did he have an argument or a fight? After a short while, Hyde said that he had done something wrong, that he had struck Mrs. Allan a couple of times with a knife, as well as the boy. Hyde would not tell him what knife he used. At no time, did Hohman volunteer the information to Hyde that he had a right to counsel or that he did not have to answer questions unless he wanted to. Shortly thereafter, Hohman told Captain Story what had transpired, and Story instructed Hohman to bring Hyde to the Captain's office.

Captain Story said that Hyde was brought to his office at 1:15 p.m. He, Hyde, Hohman, and Captains Adams and Long were present. (Adams and Long were both called and stated they did not question Hyde, but were present during his oral interrogation.) He introduced Hyde to the officers, and told Hyde he wanted him to "tell us the story of what happened at the Allan house." Hyde asked, "Where are the rubber hoses?" Story told him there would be no rubber hoses; that he would not be molested or touched in any way; that the officers were mild-mannered men; there would be no violence;

they would sit and talk quietly; and they would like him to tell what occurred at the Allan home. Story then testified to what Hyde told them. This statement of Hyde detailed practically all, if not all, of the damaging statement in the confession written by Hyde in longhand and quoted in full in footnote 2 below, *and more*. At this time, appellant was given milk and two hamburgers.

---

**2.** Statement of John N. Hyde age 21 yrs. 8035 Balto St. 6 Md. Sometime during the week of 11 thru 17 dec 1960, I noticed a girl shoveling her car from the snow. This happened several times through the course of that week. It seemed odd that a girl should be doing labor of that kind; then one day the girl had parked her car above my house and while walking past, I kidded her about that, and asked why her husband wasn't working on it. She replied, "he was not available". After some small sociable talking, she had asked me to drop down for a visit, I accepted and thanked her, returning to my house, saying it would probably be Tuesday sometime, of the following week. Monday night (of foll. week) I had planned on taking her up on that the next day. Just in case she had been kidding I decided to use a trip to the woods as an alternate occupation (and track rabbits) so I had my trench knife with me. I approached her door at 0845 and knocked, no one answered. While turning to leave one of the neighbors said she may still be in bed, I returned home. I returned to her house between 0920 and 0935 she answered my knock. I spoke to her saying "Good morning, here I am". I then entered her house and approximately at the entrance to the kitchen, she excused herself and went upstairs, returning with a robe or house coat, I turned and looked at her, she was wearing a "I am better than thou expression". I was puzzled as I was there at her invitation, and at least expected a smile, she had none. This puzzled me, and I got hurt for that reason. I requested an explanation but got none. She acted as a person would who finds out something about another, without the latters knowledge. She then took her youngest child by the sink a put a little jacket of some sort on the child, the child splashed food on the floor a she got mad exclaming something to the effect that she is always cleaning up their messes, and placed the child on the floor hard on its feet. I looked at her and wanted to know what was coming off here, inviting me down, and acting like this, she said she would call the police, I walked over and picked up the receiver, and dialed a non-existant number. She told me to stop and leave, in a semi-loud tone. I was getting mad at all this, and re-demanded an explanation, approaching her. She looked like she was frightened and mad, and started to yell, "get out," "go,"

222

Story stated that he read the printed matter at the top of the page of the written confession to Hyde and asked him if he would write the statement he had made. He replied that he would write it, but didn't feel that he should sign it. Story told him that was his prerogative, but Story would like him to write it. He began to write and when he had finished two pages, he stopped and told Story that before he finished he would like to have an attorney. Story told him he had a right to an attorney and he could have an attorney, but Story would like him to finish before Hyde called one. Hyde said alright and finished writing the statement. *All of the testimony we have set forth above* (except the written confession) *was admitted without objection.* (In addition Hyde, himself, later took the stand and voluntarily testified to everything in the written confession through where he pushed Mrs. Allan against the wall and she sat down on her "posterior." From this time, he said he did not remember anymore until he was walking out the door.) At this point, the State offered the written confession. Defense counsel objected to the written statement, and "further move[d] that all the testimony given as an oral statement by [appellant] be stricken from the record," be-

---

"no," puzzled, frightened and mad. I exploded. I reached out and pushed or shoved her against the wall she fell on her posterior, still screaming. I didn't know what all this meant. While she was on the floor screaming I reached in my pocket automatically and grabbed the trench knife and started to lunge at her I didn't know how many times. She stopped hollering and I ran from the kitchen pushing aside a piece of furniture. In the door-way a boy was there I pushed him aside, and apparently injured him with the knife, I tripped over him, and ran to the door, putting the knife in my pocket. Outside I encountered a neighbor who asked if I saw the lady yet. I don't recall what the reply was, but she gave me the phone no. of the girl, so I must have said no. I went home, had some cerial and milk, turned on the T.V., undressed and washed my clothes as I always do each day, cleaned the knife with nitro powder Solvent, and looked out the front window at the Police. They came later and I didn't resist, and cooperated to the best of my ability.

Witness: Capt. E. F. Adams

Witness: Capt. E. L. Strong

Lt. B. F. Long

cause no one ever advised him that he had no obligation to make a statement and he had requested counsel.

The court heard from the defendant at his request, but at this time only on the voluntariness of the written and oral confessions. His testimony was aimed primarily at the written confession. He admitted there had been no physical force used; that the officers told him none would be used; that he had been given food; he made no complaint of any prolonged or overbearing questioning; that the officer had not read the printed matter at the top of the page of the written statement to him; and stated the officers "filled in" the statement and he wrote it because he "was a little on the frightened side." The court stated that he was convinced beyond a reasonable doubt that the written confession was voluntary and admitted it; and he overruled the motion "to strike out the testimony of all the officers regarding any oral statements made to them."

The motion to strike *all* of the oral statements was not seasonably made, and is entirely too broad and general. Maryland Rule 522 d 2 provides that every objection to the admissibility of evidence shall be made at the time when it is offered or as soon thereafter as the objection to its admissibility becomes apparent, or the objection shall be waived. Officers Gietka and Sizemore both testified that Hyde stated, in effect, that he didn't think he would say anything more until he obtained some legal advice, yet there was no objection to their statements as to what the appellant told them. This was before Lt. Hohman testified, and he stated that he had not volunteered the information to Hyde that he was entitled to have counsel and that he was not required to answer questions; still there was no objection when Hohman stated what Hyde had told him. And all of this was before Captain Story testified, and he stated in detail, without objection, what the defendant had told him, and this statement contained everything that was in the written confession, except that Hyde had seen Mrs. Allan shoveling snow. After Hyde had completed his oral statement to Story and was writing it in longhand, Hyde said he didn't think he would finish it until he had seen counsel. It is apparent that if appellant's contention

—that a failure to obtain counsel for him and to inform him that he did not have to answer questions rendered his oral statements inadmissible—be sound, the objectionable nature of the question asked Story (to relate what Hyde had told him) was known before Story answered the question, and, in accordance with said Rule 522 d 2, objection thereto should have been made at that time. And the same thing applies to the statements made to Gietka and Sizemore, after Hyde said he didn't think he would say anything more until he had counsel, as well as to the statements made to Hohman.

Also, as pointed out above, the motion to strike was too broad. Obviously, Hyde's early oral statements, as related by Officers Gietka and Sizemore and Lt. Hohman and made before any mention concerning counsel was made by Hyde, were admissible. It is well established that if a motion be made to strike *all* of certain evidence and a portion thereof is admissible, the motion fails, *State Roads Comm. v. Bare,* 220 Md. 91, 93, 151 A. 2d 154; therefore the motion to strike all of the oral statements was properly overruled.

We turn now to the objection to the written confession. The record, we think, amply sustains the trial judge in his finding that the confession was freely and voluntarily made, and not coerced. Here, we do not have the usual factors that have been held to render a confession coerced, such as an ignorant, illiterate accused, easily open to suggestion; physical force; prolonged and uninterrupted interrogation; shuttling of the prisoner from one place to another for the purpose of confusing him; failing to provide food, etc. The only complaints advanced by the appellant are that the police (although not actually preventing his obtention of counsel) did not actually assist him in getting counsel, and the police failed to tell him he did not have to answer questions. He contends these facts necessarily made the confession the product of coercion; and its admission is the only unfairness at his subsequent trial of which he complains.

In *Crooker v. California, supra,* the record clearly revealed "that prior to petitioner's confession he asked for and was denied opportunity to call his lawyer," and his claim of coer-

cion depended "almost entirely on denial of his request to contact counsel." The appellant specifically raised the contention that even if his confession were voluntary, its use violated due process because it was obtained after denial of his request to contact his attorney. The Court rejected this contention, but stated that State refusal of a request to engage counsel violates due process if an accused "is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.'" A majority of the Court then went on to hold that, under the circumstances of that case, the confession had not been coerced (Mr. Justice Stewart, in *Reck v. Pate,* 367 U. S. 433, 440, stated the test to be: "The question [whether a confession has been coerced] in each case is whether a defendant's will was overborne at the time he confessed.") ; hence there had been no denial of due process, even though the confession had been obtained after denial of a request to contact counsel. (Of course, the absence of counsel during police interrogation is a factor that may be considered in determining whether a confession has been coerced. *Culombe v. Connecticut, supra; Hall v. Warden,* 201 F. Supp. 639, Daily Record, January 27, 1962 (U.S. D.C., Md.)).

It may be noted that the record before us does not disclose a denial of the right to obtain counsel. The most that the appellant can make out of it is a failure of the police to secure counsel for him after a statement that he did not think he would say more until he had consulted a lawyer, and he would like to see a lawyer before he completed the writing of his statement. We stated above that there is no rule in this State that renders a confession inadmissible simply because the accused was not informed that he did not have to answer questions. We hold, after a careful consideration of all of the circumstances surrounding the making of the written confession, which we will not repeat as we have set them out in some detail above, that they support the trial court's finding that the confession was voluntarily made, and not coerced. Therefore, it was properly admitted. *Crooker v. California, supra.*

This is an additional reason why the trial court's ruling upon the written confession should be sustained. And there is nothing in this holding contrary to the rulings in such cases as *Malinski v. New York*, 324 U. S. 401, *Reck v. Pate, supra,* and *Culombe v. Connecticut, supra;* those cases being readily distinguishable upon their facts.

## IV

Included in appellant's brief are several questions (which his court-appointed attorneys were unable to find substantial) presented upon his insistence. We have carefully considered them, but find they are without merit.

*Judgment affirmed.*