HARMON, ET VIR *v.* STATE ROADS COMMISSION OF MARYLAND, ET AL.

[No. 49, September Term, 1965.]

*Decided March 16, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-MOND, MARBURY, BARNES and McWILLIAMS, JJ.

*Raphael G. Urciolo,* with whom were *John A. Castagna* and *C. Osborne Duvall* on the brief, for appellants.

*R. Bowie Clagett,* with whom were *Mitchell, Clagett & Eu-wer, James R. Bucher* and *Sasscer, Clagett, Powers & Chan-ning,* and *Robert J. Woods* on the brief, for appellees.

HAMMOND, J., delivered the majority opinion of the Court. McWILLIAMS, J., dissents. Dissenting opinion at page 34, *infra.*

The State Roads Commission sought to acquire by condemnation approximately two-thirds of a one acre lot in Prince George's County for use in the building of the Capital Beltway. Claim to ownership of the property was asserted in the proceedings by two sets of claimants, each claiming under a deed from a common grantor. The parties are in agreement that the condemnation was necessary and that the fair value of the land taken plus the damage to the remainder was $5,110.60. The dispute is as to which of the claimants is entitled to the $5,110.60 and the ownership of the one-third acre not taken by condemnation.[1]

The contentions of the respective claimants were heard on a stipulation of certain agreed facts and testimony taken in open court by Judge Pugh, specially assigned. The record shows that the real property here involved was bought by William J. Moss in 1938 when he was sixty years old, and a widower, and that he lived there alone until his death in the three or four room

---

1. This third of an acre was sold by the County at a tax sale in 1964, after the taking of the other two-thirds, and was bought in by the attorney for the appellants for his clients.

house on the lot, which had neither water nor central heat, but did have electricity. He had made a living for years raising and selling flowers and vegetables and doing day work, although in his later years he seemingly had financial assistance from friends, family and the public authorities. One of those for whom Moss had worked was Omar C. Strawn, who was described as a "good friend" and who had contributed to the support of Moss from time to time. Strawn owned property nearby and on November 30, 1944, Moss conveyed his house and lot to Strawn, reserving unto himself a life estate. The stamps on the deed indicated a consideration of $1,000. The deed recited that "* * * in consideration of the sum of ten ($10.00) and other valuable considerations, and also of the payment hereafter by the said Strawn, grantee, of all taxes, assessments if any, and insurance premiums in connection with the improvements on the property * * * Moss, doth grant and convey unto the said * * * Strawn, his heirs and assigns, in fee simple, reserving to himself a life estate as hereinbefore set forth," the described property, with a usual habendum clause following. The deed was signed "William J. Moss, Widower," and duly witnessed, acknowledged and recorded.

Strawn paid the taxes or caused them to be paid from 1944 until about a year before his death in 1951 in Florida, where he had gone to live for his health's sake. It appears that the house became so dilapidated that it was uninsurable soon after 1944. In 1951 the property was advertised for sale for 1950 taxes. The appellants, Flossie Harmon, a daughter of Moss, and her husband, after they had demanded payment of the taxes from Omar Strawn's son Floyd and had been refused, redeemed the property and continued to pay the taxes each year through 1964 in a total amount of $974.42.

On May 7, 1953, Moss deeded the property to Flossie Harmon and her husband, again reserving a life estate. This deed was signed by an "X". Moss continued to live in the house as he had done since 1938, until his death in April 1961.

Before the Circuit Court the sons and daughters of Omar Strawn claimed the Moss property in fee simple as heirs of their father, relying on the deed of 1944.

The Harmons urged upon the court that Moss lacked ca-

pacity to execute the 1944 deed, that he could not read or write and his signature on that deed was a forgery and that, if the deed were assumed or found to have been his valid act, title had reverted to Moss before he executed the 1953 deed to them because: (1) there was a failure of consideration in the non-payment of taxes and insurance (apparently under a claimed analogy to cases involving confidential relations, agreements to furnish support in return for a deed, and failure to live up to the collateral agreement); (2) the estate acquired by Strawn was at most a base, determinable fee which reverted to Moss when Strawn did not pay the taxes; and finally (3) that Strawn's title was subject to a condition subsequent which caused a reversion to Moss under the facts. Finally, the Harmons said that at the least they should be reimbursed for the taxes they paid from 1951 to 1964, lest the Strawns be unjustly enriched, and the Strawns did not contest this claim.

The contention as to lack of capacity to execute the 1944 deed was abandoned below almost as soon as it was made, presumably because that incapacity, had it existed in 1944, would also have been present in 1953 when the Harmon deed was executed. The issue of forgery was resolved against the Harmons by Judge Pugh's findings of fact that Moss could write his name and had done so on the Strawn deed. Judge Pugh also found from the evidence "* * * that Strawn did in fact comply in all respects with the agreement as long as he lived," and held that he had acquired a fee simple title, subject only to the life estate of Moss, and his promise to pay taxes and insurance premiums was a covenant and did not create a condition subsequent or other possibility of reverter. His reasoning was that this Court in *Gray v. Harriet Lane Home*, 192 Md. 251, 264, upon a review of the Maryland cases, held that (a) "conditions subsequent are not favored in the law, because the breach of such a condition causes a forfeiture and the law is averse to forfeitures"; (b) "* * * when the language of an instrument does not clearly indicate the grantor's intention that the property is to revert to him in the event it is diverted from the declared use, the instrument does not operate as a restraint upon alienation * * *"; and (c) "* * * no condition subsequent will be implied unless there is a gift over or unless there

are words indicating an intent that the grant is to be void if the condition is not carried out." Judge Pugh found no gift over in the deed to Strawn and reasoned that if words of the deed did not clearly state a covenant rather than a condition, then the meaning was at least doubtful, making apposite the theory of *Bartell v. Senger,* 160 Md. 685, 689:

> "And where the very language out of which * * * [conditions] are said to arise itself raises a doubt as to whether the parties intended them to operate as 'conditions,' or as 'covenants,' it will be assumed that their intention was to create a covenant rather than a condition."

He cited also *Stewart v. Redditt,* 3 Md. 67, 80:

> "We are then asked to say, that unless Marshall, the grantee, 'performed his part of the stipulation mentioned in the said paper-writing, that then no title vested in him' by virtue thereof. In the first place, there is no sufficient proof that he did not perform his covenants; but conceding that he did not, the effect of such an omission or breach of contract would not be to avoid the deed. If there was a breach of the covenant, the proper remedy would be an action on the covenant itself."

Whether Judge Pugh was right in his determination that if the deed from Moss to Strawn was a valid conveyance which had in fact been executed by Moss the title that Strawn took did not revert to Moss because Strawn did not pay or supply the taxes and insurance premiums is not an issue now before us, and we are not called upon to decide it. The appellants may have been persuaded by Judge Pugh's opinion of the correctness of his conclusions on the construction and effect of the deed and of the improbability that this Court would disagree with him, but whatever their reason they unquestionably waived and abandoned the point on appeal. The appellant's brief states the questions presented as:

1. Did the lower Court err in admitting into evidence the deed from William J. Moss to Omar C. Strawn dated November 30, 1944?

2. Did the lower Court err in denying the motion for a directed verdict in favor of the Harmons at the end of the testimony offered by the heirs of Omar C. Strawn? ["On the ground that they haven't proved that the signature on the deed is actually the signature of Mr. Moss."]

The argument in appellants' brief is devoted solely to the two questions presented and there is no reference to the matter of the construction and effect of the deed, assuming it to have been a valid instrument. The brief of the appellees is addressed only to the questions posed by the appellants. Each side argued these questions orally, and neither argued the construction and effect of the deed to Strawn. "An appellant can, of course, abandon some of the issues raised below and stand here on a narrower ground." *Weil v. Free State Oil Co. of Md.*, 200 Md. 62, 66. How this may be done is illustrated in *Bishop v. Bd. of Co. Comm'rs*, 230 Md. 494, 500, where Chief Judge Brune said for the Court:

> "One question of law which was raised in the trial court has not been urged on appeal. We therefore do not decide it. *Comptroller of Treasury v. Aerial Products, Inc.*, 210 Md. 627, 644 * * *; *Mullan v. Mullan*, 222 Md. 503, 506 * * *; *Baxter v. State*, 223 Md. 495, 502 * * *; *Hyde v. State*, 228 Md. 209, 218 * * *. Cf. Maryland Rule 846 f. That question was the validity or invalidity of the Acts of 1957, Ch. 712, § 1113 (d) * * *. The trial court held this provision unconstitutional. The appellants do not challenge this holding and we, therefore, do not pass upon it."

The holding in *Bishop* was not new. See *State v. Cavey*, 173 Md. 445, 447: "Counsel for appellant confined their argument to the exception relating to the rulings upon the prayers, hence the remaining exceptions will be treated as abandoned." The same principle has been applied in a very late case, *Myers v. Chief of Fire Bureau*, 237 Md. 583, 590. Chief Judge Prescott said for the Court: "No question on appellant's prayer for a writ of certiorari was pressed or argued in his brief. The point

was abandoned. Maryland Rule 831." In *State Roads Comm. v. Halle,* 228 Md. 24, 31, the Court stated:

> "The record sustains the fact that this motion [to strike testimony of experts as to an important theory of appellant's case] was made and denied.
>
> "But neither under this heading [statement of facts in appellant's brief] nor the heading of 'Argument' in its brief does it present any argument in support of its contention on this point, nor do the appellees deal specifically with the question. Under these circumstances, we conclude the point has been waived. Maryland Rule 831 c 4; cf. *Fid. & Dep. Co. v. Mattingly Lumber Co.,* 176 Md. 217, 220 * * *; *Comptroller v. Aerial Products,* 210 Md. 627, 644 * * *."

See also *Hyde v. State,* 228 Md. 209, 218:

> "Maryland Rule 831 (subsections c 2, and c 4) provides that appellant's brief shall contain 'a succinct statement of the questions presented separately numbered,' and 'argument in support of the position of the appellant.' Appellant's brief contains neither in respect to the matter now under consideration, and we have held that a question not presented or argued in appellant's brief was not before the Court of Appeals, although it was brought to the attention of the Court during argument."

The proposition is restated in *Nutter v. Non-Profit Housing,* 230 Md. 6, 17, cited in *Dessel v. Goldman, Jr.,* 231 Md. 428, 430-31:

> "However, the question of the propriety of the allowance of costs was not presented as a question or argued in appellant's brief, and we do not consider it to be before us for review. Maryland Rule 831 c 2, 4."

*Nutter v. Baltimore,* 232 Md. 210, 213, elaborated on the rule and gave illustration of some of the underlying reasons for its application:

> "Appellants apparently misunderstand why the point was not 'before us for decision.' * * * It was because

of their failure, through lack of diligence or deliberate and considered action, to present it to the Court properly. Although the above mentioned contention was not specifically 'before us for decision,' the only reason that it was not was the fact that appellants by failing to raise and argue it in their brief waived the same. Maryland Rule 831, 831 c 2, 831 c 4 * * *."

See also the cases cited in 2 Maryland Law Encyclopedia, *Appeals,* Ch. 15, under the headings "Scope of Review in General," Part F, "Error Waived on Appeal," § 401, "An error committed in the lower court may be waived on appeal either expressly or by implication," and § 402, "The failure on appeal to discuss or urge an objection made, or an error committed, in the lower court will be considered as a waiver or abandonment thereof."

We turn to consideration of the points properly presented for decision on appeal—that the deed from Moss to Strawn should not have been received in evidence because it was a forgery and that the Circuit Court should have so ruled at the conclusion of the case presented in behalf of the Strawn heirs. Neither contention has merit.

The introduction of the certified copy of the Strawn deed, an instrument duly recorded as required by law, presented to the trial court prima facie evidence of the genuineness of the instrument and cast upon the Harmons the burden of going forward and persuading the court that the purported conveyance was not the valid act and deed of Moss. See *Classen v. Classen,* 57 Md. 510; *Hutchins v. Dixon,* 11 Md. 29; *Warner v. Hardy,* 6 Md. 525; and *Craufurd v. The State,* 6 H. & J. 231.

The Harmons attempted to meet their burden by offering testimony that Mrs. Harmon's father, Moss, could not write, and by showing, as one of the Strawn sons agreed, that Moss was generally considered illiterate. Judge Pugh found that the testimony established that Moss was illiterate, and in his later years could not sign his name except by making an "X" but he also found that Moss could write his name in his earlier years and that the deed to Strawn in 1944 in fact had been signed by Moss although he said his signature appears to be the signature of "* * * a feeble, illiterate or unsure man."

The Strawns had presented to the court evidence that Moss had executed a grant of a right of way to the Consolidated Gas, Electric Light and Power Company of Baltimore in 1939, which bore the signature "William J. Moss" and was duly witnessed, acknowledged and recorded, knowledge of which had come to them only on the morning of the trial. Judge Pugh suggested that the original instrument or a photostatic copy thereof be procured from the Gas Company and given the court for comparison of the signature thereon with the signature on the original Strawn deed, which the Strawn heirs offered to the court for such comparison. The Harmons did not object to this and did not seriously contend that Moss had not signed the 1939 instrument. Judge Pugh later made the comparison and was satisfied that the same person had signed both the 1939 grant and the 1944 deed and that that person was Moss. Both signatures were before us and we cannot say that Judge Pugh's findings of fact were clearly erroneous.

Inasmuch as the Strawns had offered to the court a certified copy of a deed purporting to vest fee simple title in their ancestors and the parties had in effect agreed that an inherently valid signature of Moss would be made available to the court as a basis for comparison of the challenged signature on the 1944 deed before the case was decided, there was no error in denying the Harmons' motion for a directed verdict at the conclusion of the last live evidence offered by the Strawns.

In his original order dated February 2, 1965, Judge Pugh declared "* * * that the title to the property described in the deeds filed in this case * * * is hereby declared to be the property of the heirs of Omar C. Strawn * * *," and in a supplemental opinion and decision, dated February 15, 1965, he ordered:

"* * * that the sum of $5,110.60, deposited (or to be deposited) in the Registry of this Court be, and the same is hereby declared to be the property of the heirs of Omar C. Strawn, subject to the payment to the Washington Suburban Sanitary Commission of the sum of $360.60 for the redemption of its front foot benefit assessment, and further subject to the re-payment of the sum of $974.42 to Flossie M. Harmon and

Mark A. Harmon, the said Opinion and Decision to remain in all other respects unchanged * * *."

Both of these orders will be affirmed.

*Orders of February 2, 1965, and February 15, 1965, appealed from, affirmed, the heirs of Strawn to pay the costs.*

McWILLIAMS, J., filed the following dissenting opinion.

I remain convinced that the deed from Moss to Strawn created a condition subsequent, that there was a breach of that condition resulting in a forfeiture and that Moss subsequently conveyed a fee simple title to the Harmons, subject, of course, to his life estate.

The majority, invoking the "rule" which permits the Court to ignore any point not argued either orally or in the brief, declined to consider whether a condition subsequent had been created. This "rule" is as much honored in the breach as in the observance. The Court has never hesitated to consider questions it has thought necessary or desirable to consider whether or not they have been argued by counsel orally or in the brief. The cases cited in the majority opinion, when subjected to close scrutiny, reveal nothing more than a discretion which the Court may exercise at will. Nowhere will there be found a precedent which precludes the Court from considering *any* point or question tried or decided by the lower court or, indeed, *any* point or question which was presented, but not decided. The Court is surely not estopped from considering questions of importance; surely it is not required to close its eyes to that which is apparent; nor should any such "rule" be so inflexible that the Court would be powerless to prevent a miscarriage of justice *L. S. Ayres & Co. v. Hicks,* 220 Ind. 86, 41 N. E. 2d 195 (1942) ; *Gleason v. Hardware Mutual Casualty Company,* 331 Mass. 703, 122 N. E. 2d 381 (1954) ; *State v. Apodaca,* 42 N. M. 544, 82 P. 2d 641 (1938) ; 5 Am. Jur. 2d, *Appeal & Error,* § 693 (1962) ; 5B C.J.S., *Appeal & Error,* § 1802 (1958). See *Goldman v. Johnson Motor Lines,* 192 Md. 24, 31, 63 A. 2d 622 (1949) ; *Mullen v. Brydon,* 117 Md. 554,

561, 83 Atl. 1025 (1912) ; *Desche v. Gies,* 56 Md. 135 (1881) ; Maryland Rule 846 f.

Judge Pugh devoted a substantial portion of his opinion to his reasons for deciding that a condition subsequent had not been created. I believe he was wrong and I think that this Court, in order to prevent what seems to me to be an obvious miscarriage of justice, should have reversed his decision. I have set forth the reasons why I think so.

But for the magic touch of the State Roads Commission this dispute might have slumbered on for years, and, indeed, might never have awakened. At stake are part of a one acre lot,[1] in Prince George's County, and the avails ($5110.60) of a proceeding [2] to acquire the balance by condemnation.

The lot, most of which is now occupied by the Capital Beltway, was bought in October of 1938 by William J. Moss, a 60 year old, illiterate widower. On 30 November 1944 he conveyed the lot to Omar C. Strawn, reserving to himself a life estate, the consideration being, in addition to the usual $10, "other valuable considerations," "and also the payment *hereafter* by the said Strawn, grantee, of all taxes, assessments if any, and insurance premiums in connection with the improvements on the property hereinafter described * * *." (Emphasis supplied.) Although there is no evidence that any insurance premiums were ever paid, it seems to be agreed that Strawn, or someone in his behalf, paid the taxes up to and including 1949. In the spring of 1951 the property was advertised for sale because the taxes for the year 1950 had not been paid. Flossie Harmon (the daughter of Moss) and Mark M. Harmon, her husband (the appellants), claiming that Strawn and his son, Floyd Strawn, refused the request of Moss and themselves to pay the taxes, redeemed the property from the tax sale and continued thereafter to pay the taxes.

Strawn died in Miami in June 1951, leaving a widow (since deceased), two sons, Faber W. Strawn and Harry O. Strawn, a daughter, Ella Strawn Tucker, and Zoe Webster, the daugh-

---

1. Actually 40,000 sq. ft., of which 26,914 sq. ft. (including the dwelling) were taken, leaving 13,086 sq. ft. remaining.

2. All parties in interest, by a stipulation filed in the proceedings, agreed on the amount.

ter of a deceased son, Floyd L. Strawn, whose widow intervened in the court below. His will, probated in Florida, although mentioning Florida real estate, makes no reference to realty in Maryland. Faber Strawn was named executor and, in September 1955, he was appointed ancillary administrator by the Orphans' Court for Prince George's County.[3] All of the aforementioned, in addition to the State Roads Commission, the Washington Suburban Sanitary Commission and the County Commissioners for Prince George's County are the appellees.

On 7 May 1953, Moss conveyed the property, again subject to a life estate in himself, to the Harmons (appellants). He had occupied the property continuously from 1938 and continued to do so until his death on 21 April 1961. After long and unsuccessful attempts to negotiate with the parties,[4] the State Roads Commission, on 6 March 1963, filed the usual condemnation petition, depositing with the clerk its estimate of the value of the part taken plus the damages to the remainder ($4000).

The 13,086 square feet remaining after the taking by the State Roads Commission was sold for non-payment of the 1963 taxes on 2 March 1964 to Raphael G. Urciolo. Since Mr. Urciolo entered his appearance in this case for Mrs. Harmon on 10 December 1963, it will be assumed that he was acting in her interest when he became the tax sale purchaser. As to whether there was any effort by or on behalf of the Strawns to redeem the property, the record is silent.[5]

Both the Harmons and the Strawns claimed the fund and on 25 January 1965 evidence was produced before Judge Pugh in support of their respective contentions and he considered whether the language used in the deed from Moss to Strawn created a condition subsequent. After deciding it did not, he declared that, even if a condition subsequent had been created,

---

3. No mention of the property is made in the real inventory and at the time of trial (10 years after Strawn's appointment) the ancillary administration had not been concluded.

4. Faber Strawn was asserting his claim to the State Roads Commission as early as 1961.

5. Faber Strawn said he did not know the property had been sold for taxes.

neither Moss nor the Harmons took action sufficient to accomplish a forfeiture.

That the condition subsequent is an unpopular stepchild is well established. In *Sands v. Church, Etc.,* 181 Md. 536, 542, 30 A. 2d 771 (1943) we said:

> "It is a familiar maxim that conditions subsequent are not favored in law, for the breach of such a condition causes a forfeiture, and the law is adverse to forfeitures."

The same language will be found, either *in totidem verbis* or in close paraphrase, in dozens of textbooks and in countless decisions. It must not be supposed, however, because this stepchild is disliked, that it has been forsaken. In *Trustees St. Charles Col. v. Carroll,* 121 Md. 464, 478, 88 Atl. 277 (1913), after stating the language of *Sands supra,* set forth above, we said:

> "But they [conditions subsequent] may be annexed to grants and when the intention of the parties is clear the Court is bound to respect it."

Professors Simes and Smith indicate a class of cases into which this case very readily fits:

> "The judicial dislike for forfeitures, because of their harshness, is manifested in several ways. First, as we have seen, the courts go to great lengths to avoid a construction of language which will result in a finding that a condition subsequent has been created. Second, even after they have been forced to admit that a condition subsequent has been created, they seek to avoid finding that there has been any breach. Thus, where the condition requires the grantee to do an affirmative act, the court will allow a reasonable time for its accomplishment, and will extend the time when war conditions have rendered performance difficult. Moreover, courts of equity as a rule refuse to declare a forfeiture or to assist the holder of a right of entry for breach of condition in securing possession when there has been a breach. *In rare instances, however, where the equities are all in favor of the creator of the*

*right of entry, it appears that a court of equity will aid him in forfeiting the estate for breach."* (Emphasis supplied.) 1 Simes & Smith, *Future Interests,* § 257 (2nd Ed. 1956).

There seems to be no foolproof formula for either the creation or the determination of an estate on condition. As Mr. Tiffany puts it:

"While certain words are said to be appropriate for the creation of a condition, such as 'on condition,' 'provided,' 'so that,' no particular words are required, it being purely a question of the intention of the grantor or testator as gathered from the whole instrument." 1 Tiffany, *Real Property,* § 190, at 305-06 (3rd Ed. 1939).

And it has been said that the intention of the parties may be gathered not only from the whole instrument but from their acts and the surrounding circumstances as well. In the Restatement of Contracts, § 45 g (1936), it is said:

"Among the considerations pertinent to the determination of whether an estate in fee simple subject to a condition subsequent is created are the language of the limitation, the language in other parts of the instrument, such as the consideration stated and the recitals, if any, and relevant facts external to the instrument, such as the actual consideration, the relation of the parties and the purpose of the conveyance."

In *Brown v. Whitefield,* 225 Md. 220, 225, 169 A. 2d 920 (1961) Judge Sybert, for the Court, said:

"It is well settled that in construing a deed, the effect which most nearly accords with the intention of the parties is given the first consideration unless to do so would violate some rule of law. *Adams v. Parater,* 206 Md. 224; 111 A. 2d 590 (1955); *Weiprecht v. Gill,* 191 Md. 478, 62 A. 2d 253 (1948). Thus, we must look to the intent of the parties here to determine what land they meant to convey. *Whittington v.*

*Mann*, 211 Md. 199, 126 A. 2d 617 (1956); *Jay v. Michael*, 82 Md. 1, 33 Atl. 322 (1895). In essence what we must do is to place ourselves, to the degree possible, in the same situation and circumstances as the parties—to occupy their seats, so to speak—at the time the instrument was executed, and in this vicarious role to seek the result intended by the parties. *Whittington v. Mann, supra; Hodges v. Owings,* 178 Md. 300, 13 A. 2d 338 (1940); Restatement, *Property,* § 241. The language used by the parties will of course be of utmost importance in ascertaining their intent. *Whittington v. Mann, supra; Weiprecht v. Gill, supra; Maryland State Fair v. Schmidt,* 147 Md. 613, 128 Atl. 365 (1925)."

Nor is it necessary, as Judge Pugh seemed to think, that there be express words to the effect that the property shall revert to the grantor on forfeiture. 1 Simes & Smith, *Future Interests,* § 247, at 280 (2nd Ed. 1956); 1 Tiffany, *Real Property,* § 190 (3rd Ed. 1939). See *Kiser v. Lucas,* 170 Md. 486, 185 Atl. 441 (1936); *Jenkins v. Horwitz,* 92 Md. 34, 47 Atl. 1022 (1900); *Bennett v. Humane Imp. Socy.,* 91 Md. 10, 45 Atl. 888 (1900); *Stansbury v. Hubner,* 73 Md. 228, 20 Atl. 904 (1890).

The case at bar is very much like those cases where the grantor conveys his property to a grantee in consideration of an agreement for support, maintenance and care. It has been said that such cases are sui generis, that they are peculiar in their character and incidents and that courts deal with them on principles not applicable to ordinary conveyances. *Manning v. Street,* 279 Ky. 253, 130 S. W. 2d 735 (1939); *Russell v. Carver,* 208 Ala. 219, 94 So. 128 (1922); 4 Thompson, *Real Property,* § 1880 (Repl. Vol. 1961); Annot., 76 ALR 742 (1932).

In *Tibbetts v. Krall,* 128 Ind. App. 215, 145 N. E. 2d 577 (1957) the grantor, at age 60 and after a serious illness, conveyed to her nephew a farm in Madison County, Indiana. The deed contained the following provision:

"This conveyance is made upon *consideration* that the grantees move into the dwelling house on said land

and reside therein with grantor and provide a home therein for grantor as a member of their family and care for her in sickness and in health and all with kindness and consideration and all so long as said grantor shall live. Not however to provide nurse hire or Physician or medicines or wearing apparel. *And grantees also to keep all taxes on said land paid and the improvements insured and in reasonable repair."* (Emphasis supplied.)

Some years later she demanded the reconveyance of the property, and, upon the refusal of the grantees to do so, she filed suit. The language of the court, which affirmed the judgment in her favor, is particularly pertinent.

"There can be no question but that the agreement to care for the appellant 'as a member of their family * * * in sickness and in health and all with kindness and consideration and all so long as said grantor shall live', which was stated as a consideration for the deed in question, *created a condition subsequent so long as such contract for support remained executory, as it is well settled that a grant of land in consideration of an agreement for the future support of the grantor, in the absence of a stipulation to the contrary, creates in the grantee an estate on the condition subsequent.* Huffman v. Rickets, 1916, 60 Ind. App. 526, 111 N. E. 322; Lindsay v. Glass, 1889, 119 Ind. 301, 21 N.E. 897. Such contracts, in which aged and infirm persons convey their property to others in consideration of an agreement for support, maintenance, and care, are almost universally recognized by the courts as constituting a class by themselves in matters pertaining to their construction and interpretation, and, as has been reiterated in several decisions, until such contract is fully performed on both sides it is liable to be rescinded and the property reclaimed, leaving the parties to their remedies respectively for what may have been furnished under the contract." *Id* at 581 (Emphasis supplied.)

The following quotation from a Rhode Island decision helps to explain the willingness of courts to lend their assistance in the enforcement of this kind of condition subsequent.

> "While such contracts are not often in form a trust, they are usually in fact a trust. One under the stress of infirmity or age surrenders his property to another, for relief from care and anxiety, and receives in return an assurance of support. The result, so far as the donor is concerned, would be no different if he had made an express deed of trust. The parties do not contemplate a mere contract, but an obligation binding on conscience as well as in law. The arrangement rests in confidence on the part of the grantor. It would, indeed, be a hard rule, when the feeble party has fully performed his part of the contract in the hope of security and quiet, to require him to spend the remainder of his life in lawsuits to compel performance by the other party." *Grant v. Bell,* 26 R. I. 288, 58 Atl. 951, 951-52 (1904).

Let us now "place ourselves" in the "same situation and circumstances" in which Moss found himself when he signed the deed to Strawn and "occupy * * * [his] seat(s), so to speak." *Brown v. Whitefield, supra.* He was 67 years old, illiterate, alone and possessed of but two assets, his health and his property. He was able to raise and sell a few flowers, some fruit and vegetables and do odd jobs. Mrs. Harmon gave him money from time to time and it is likely he was receiving some public assistance.[6] It may be assumed, therefore, that he was not unduly concerned about support and maintenance. It is quite possible, however, that he was concerned about one serious threat to his security and independence, namely, taxes and insurance, to pay for which, hard money was required. Since the property was unencumbered he would have nothing to fear if a hedge against tax sales and fire could be obtained. From whence came the suggestion that he deed the property to his

---

6. Strawn testified his father "had contributed to his support a certain amount."

old friend (Strawn) I do not know but it can readily be assumed that he considered it a solution of his problem. And so it was—for a while.

One can imagine, in the closing months of 1950, his anxiety and concern over Strawn's refusal, after repeated requests, to pay the taxes; and his deepening concern and alarm when his property was advertised for sale early in 1951. The very dragon he thought he had slain was now about to devour his homestead. But the Harmons came to the rescue and thereafter continued to pay the taxes.

Appellees appear to excuse Strawn's default by saying that he was ill. Perhaps he was, but there is no evidence of the nature of his illness or that it prevented him from attending to his business affairs. He was well enough, in 1950,[7] to make an elaborate will, containing many bequests, referring to realty in Florida (but not in Maryland), and providing for a mentally incompetent wife. Since the property was assessed to him it must be assumed he received tax bills and had notice of the date and terms of sale, which he survived by about four months.

Despite knowledge, both actual and constructive, of the circumstances, neither Strawn nor his son and executor, Faber Strawn, ever made the slightest effort after 1949 to pay the taxes or reimburse the Harmons for their payments. Neither of them made the slightest effort to rescue the property from the tax sale. That this was an oversight should, in my opinion, be rejected.

Faced with this breach of the condition and anticipating that the Strawns would not attempt to reestablish their status as remaindermen, Moss, after waiting two years, conveyed the property to the natural objects of his bounty, the Harmons, reserving a life estate for himself. Although no condition subsequent was written into the deed to the Harmons, it is probable that one was intended since they continued to pay the taxes until the old man's death. The question now is whether a forfeiture was accomplished.

No principle of law is more securely established than that which requires the enforcement of a breach of a condition sub-

---

7. Except for the year, the will was undated.

sequent to be made by formal entry by the grantor, either by way of taking actual possession or by way of ejectment or some other appropriate legal proceeding. Less well known but no less well established are the principles applicable to situations where the grantor is already in possession, as Moss was in the case at bar. There is substantial authority for the proposition that where the grantor is in possession the estate revests in him at once without any formal act on his part. There are, however, holdings that something more than mere possession is needed.

In support of the automatic revesting will be found both courts and authors of textbooks.

"* * * If the grantor is himself in possession of the premises when the breach happens, the estate revests in him at once without any formal act on his part, and he will be presumed, after the breach, to hold, for the purpose of enforcing a forfeiture, unless he waive the breach, as it is competent for him to do, and as he may do by his acts." Washburn, *Real Property*, § 957, at 18 (6th Ed. 1902).

"Lydia Marwick, for whose use the condition was to be performed, was the heir-at-law of the testator, and she occupied the premises to the time of her decease. It is therefore insisted, that no formal entry was required of her to create a forfeiture of the estate.

"The law will presume, that a person, who cannot make a formal entry upon the estate of another for condition broken, because he is already in possession, intends to hold possession to enforce all his legal rights, unless there be some indication, that such was not his intention, by which the presumption of law may be rebutted." *Andrews v. Senter,* 32 Me. 394, 397 (1851).

"* * * An estate upon condition subsequent, does not revert until entry for the condition broken. 4 Kent's Comm. 122, *et seq.*—2 Black, Comm. 155, 165. —*Cross v. Carson,* 8 Blackf. 138.—*Doe v. Cassiday,* at the present term (1). But the evidence shows that *J. A. Thompson* remained in possession likewise, as his devisee. *He could not enter upon his own posses-*

*sion, for condition broken; and, although he might, perhaps, under the circumstances, have proceeded by action to divest the estate of the grantee, it would have been a useless act, which the law does not require.* The defendant set up her title in opposition to that of the plaintiff in this action, and we are of the opinion that that was sufficient." *Thompson v. Thompson,* 9 Ind. 323, 329 (1857) (Emphasis supplied.)

*Accord, Lincoln & Kennebeck Bank v. Drummond,* 5 Mass. 321 (1809); *Moore v. Wingate,* 53 Mo. 398 (1873); *Rollins v. Riley,* 44 N. H. 9 (1862).

That something more than mere possession may be necessary is indicated by 4A Thompson, *Real Property,* § 1981, at 428-29 (Repl. Vol. 1961):

> "If the grantor is himself in possession when the condition is broken, the estate revests in him at once, and his possession is presumed to be for the purpose of holding under the forfeiture. If he is already in possession, it is, however, in some cases declared that the grantor must manifest an intention of holding by reason of the breach of condition; * * *"

Assuming that possession, without more, after breach of a condition, is sufficient to effect a revesting of the grantor's estate, there can be little doubt that Moss's possession was adequate, for, as I have already indicated, he was in actual, physical possession of his property from the day he bought it to the day he died. In any event, the execution, delivery and recording of the deed to the Harmons makes it unnecessary to go that far. This was a positive, definite and unequivocal manifestation of an intention to effect a forfeiture. It was constructive notice to the world, and, as it turned out, actual notice to the Strawns,[8] that he claimed ownership of the property. Nor

---

8. In his testimony Faber Strawn indicated he was aware of this deed at about the time of its execution. In paragraph 6 of an affidavit filed 8 Jan. 1964, in this case, by Faber Strawn, the following language appears. "That approximately ten years ago, after the recordation of the aforesaid deed (Liber 1606, Folio 202), the defendants, Flossie A. Harmon and Mark M. Harmon voluntarily commenced to pay State and County taxes on the aforesaid

is there any evidence of subsequent conduct or statements on his part which could support a claim or inference of waiver.

In the opinion of the trial judge there is an observation that "no action appears to have been taken" by Moss or his "heirs" after Strawn's death. If "action" is intended to mean some sort of court proceeding and, if it is inferred that such an action is essential to the revesting of Moss's property, under the circumstances here presented, then, I must disagree. All that is required of the grantor is some appropriate act indicating his election to enforce the breach. 1 Simes & Smith, *Future Interests,* § 255a (2nd Ed. 1956) ; *Hubbard v. Hubbard,* 97 Mass. 188 (1867). Continued possession coupled with a subsequent conveyance have been declared to be a sufficient manifestation of intention. *Blum v. Bush,* 86 Mich. 206, 49 N. W. 142, 144 (1891). It occurs to me that perhaps the only action available to Moss would have been a bill to remove a cloud on his title. It can safely be assumed, however, that he was completely unaware of the existence of such a proceeding. Indeed as far as he was concerned, there was no cloud on his title. The Strawns were neither claiming nor exhibiting any interest, past, present or future in his property. He had deeded it to the Harmons and they were paying the taxes. To borrow an apt colloquialism, "He had it made."

Looking at the case as a whole one could not say it would be unreasonable to conclude that a decision to abandon the future interest in the Moss property was made as early as 1950. Such a decision might very well reflect the exercise of good business judgment. There was the possibility that both the assessment and the tax rate would increase. The house might be destroyed. Moss might live for quite a long time. The end result might be a cumulative total expenditure in excess of the value of the property. Certainly there is no evidence (except claiming the stipulated damages) inconsistent with such a conclusion. The courts ought not help one who has abandoned the goose to run off with the golden egg.

I would have reversed Judge Pugh.

property, *representing to the Strawn family* that they were in a financial position to do so, and desired to do so as a gesture of friendship for the now deceased William J. Moss, the father of the defendant Flossie H. Harmon." (Emphasis supplied.)